OF THE

## STATE OF MISSOURI

AT THE

### APRIL TERM, 1914

*(Continued from Volume 259.)*

## WILLIAM A. TURNER v. MARY W. ANDERSON et al., Appellants.

In Banc, July 2, 1914.

1. RES ADJUDICATA: Demurrer. to One Issue: Judgment and Reversal on Another. Where the trial court, in a will contest, by sustaining a demurrer, ruled there was no sufficient evidence to sustain the pleaded issue of testator's incapacity to make a will, but submitted the case to the jury on the issue of undue influence, and the jury found for contestants on that issue; and on appeal by contestees only, the court held there was no substantial evidence of undue influence, but that there was such evidence of testator's incapacity as entitled contestant to go to the jury on that issue, and remanded the cause for a new trial "in accordance with the views" therein expressed, the contestant is entitled to a new trial and a verdict of the jury upon that issue. The court adheres to its pronouncement made on the former appeal that it was not shut up to the one course of reversing the verdict and directing a judgment probating the will.

2. ———: Former Appeal: Holding of Substantial Evidence: Remanded for New Trial: Same Holding on Second Appeal.

.Although the court on the former appeal held there was sub-stantial evidence of testator's incapacity to make the will, and remanded the case for a new trial on that issue, and the jury on a trial of that issue found there was no will, the Supreme Court on an appeal from a judgment on that verdict will not hold that the question of substantial evidence to sustain the verdict is *res adjudicata*, but will again review the evidence to the extent of determining whether or not it was sufficiently substantial to sustain the verdict, where contestees' counsel on the former appeal were not without some justification in re-fusing to brief the question of testamentary incapacity. But in so ruling it will not hold as wholly without significance the facts that on the former appeal the court were unanimous that the issue of testamentary incapacity was for the jury, that on a retrial the jury found the issue against proponents, and that the trial judge refused to set the verdict aside as against the weight of the evidence.

3. **WILL CONTEST: Testator's Incapacity: Shown by Witnesses.** Notwithstanding testator had had convulsions, which at first were thought to be referable to stomach troubles, but later were diagnosed as epilepsy, and when later his will was made it was witnessed by the lawyer who drew it and testator's family physician; and notwithstanding the testimony reveals that the attorney knew that testator was in charge of a specialist in mental diseases and did not consider him in good mental condition, and had the epileptic attacks in mind when he advised that the family physician be asked to witness the will, it will not be held that proponents failed to make out a case of testamentary capacity in the first instance, if said lawyer also testified that he considered testator of sound mind and testamentary capacity, and the physician, that he had a sound mind at the time he witnessed the will.

4. ————: ————: **Testator's Own Opinion.** A remark made by testator when he asked his physician to witness his will, to the effect, "I am all right," is not conclusive against his being of sound mind.

5. ————: **Witnesses: Lawyer and Physician.** It cannot be held as a matter of law that a family lawyer or a family physician may not witness a will, nor that their testimony, being shown to be men of probity, has no probative efficacy of testator's testamentary capacity.

6. ————: **Witness: Attorney for Contestees.** A will is not to be held invalid or sourly considered because the family lawyer both drew and witnessed the will and at its contest appears as attorney for proponents. But if an attorney were to write and witness the will, and then attempt to break it, a different case would be for consideration.

Turner v. Anderson.

7. ————: **Action at Law.** A statutory will contest is an action at law, pure and simple, and is to be treated in an appellate court strictly as a law suit. In a will contest, the appellate court leaves to the jury the office of weighing the evidence, and to the trial court the exclusive office of setting aside a verdict because against the weight of the evidence, the same as it does in all other actions at law.

8. ————: ————: **Right to Make Will.** Courts are fond of sustaining wills. The right to dispose of one's own stands now, as always, on the soundest foundation, and is not to be frittered away by piecemeal or indirection; and courts are not blind to the fact of an itching in jurors to break wills and of an assumption on their part that they know better how a testator should have divided his property than he did, and hence they sedulously guard against that tendency and search the proof educed in support of an issue of undue influence or testamentary incapacity with a critical eye. But notwithstanding those facts, a demurrer to the evidence in a will contest is to be judged by the general rule applicable to similar demurrers in other law cases, and that rule is elaborately stated in Williams v. Railroad, 257 Mo. 1. c. 112.

9. ————: ————: **Canvassing Proof.** Where there is substantial evidence tending to show testator's incapacity to make a will and equally substantial evidence to the contrary, it is but confusing the issue on the demurrer to the evidence for the appellate court to canvass the proofs educed by proponents to sustain the will. The weight of the evidence was for the jury.

10. ————: *Demurrer to Evidence: Facts for Consideration on Appeal.* On proponents' demurrer to contestants' evidence in the will contest, the appellate court is concerned only with the admitted facts and with the tendency of contestants' reasonable and material proof, whether contradicted or not by that for proponents.

11. ————: **Inequalities.** Mere inequalities in a will do not impugn it, nor, standing alone, are they sufficient evidence of testamentary incapacity or undue influence; but when there is other competent and substantial proof of either issue, the rule is that unnatural and marked inequalities in a will, based on no reasonable ground, are factors to be reckoned with on either issue, in combination with other testimony.

12. ————: *Epilepsy: Eccentricities.* Mere oddities and eccentricities combined together, however artistically selected, arranged and paraded, do not alone show such testamentary incapacity as justifies a submission of the issue to the jury; but seated aberration of mind will do so; and epilepsy, being

Turner v. Anderson.

a mental disease, may bring about such a mental condition; and that mental condition is sufficiently shown to compel the issue to be submitted to the jury when it is shown that testator for a number of years before he made the will suffered repeated attacks of epilepsy, both *grand mal* and *petit mal*, and during that time there was a breaking down of his moral and mental faculties, as manifested by inability to control his emotions and to fix his attention upon current and important business matters, forgetfulness in such business matters, a loss of confidence in his judgment to manage them (pointedly contrary to his steadfast business course before epilepsy began), delusions as to debtors who never owed him anything, loss of mental reckoning, reliance on others for management of his more important business, whimsical and unbusinesslike acts connected with what business he still assumed to manage, a recognition of his incapacity to even assist in the management of a bank of which he continued to be president, unexplained irrational attitude towards his children, actual dishonesty in dealings with them, and forgetfulness in his will of a solemn promise to a dying daughter to make her children equal with his other children.

*Held*, by BOND, J., dissenting, that where periodical epilepsy is shown, and proponents show that at the time the will was executed and for some time prior thereto testator's mental faculties were good and normal, and there is no showing to the contrary, the question cannot be submitted to the jury.

*Held*, by BOND, J., dissenting, that the correct rule is, that epilepsy is not in and of itself insanity, nor does it render its subjects incapable of normal and intelligent action except during the period of the seizures or at a time before or after, when the mind of the sufferer is still under the dominance of the disease. It may become insanity when, either from the violence and frequency of the attacks, or by complication with other ailments, it acquires sufficient power to destroy the mind of its subject. There is no evidence in this record that either of these conditions existed prior to the making of the will of the testator.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas*, Judge.

AFFIRMED.

*Reed & Harvey* and *Paxton & Rose* for appellants.

(1) That part of the opinion in Turner v. Anderson, 236 Mo. 523, 542, relating to testamentary capac-

ity, was *coram non judice,* and is not binding on this
appeal, because no one appealed on the issue of testamentary capacity, and there was no such issue before this court. McFadden v. Rippey, 8 Mo. 740; Campbell v. Coquard, 93 Mo. 474; Nearen v. Bakewell, 110
Mo. 645; Sanderson v. Wertz, 44 Mo. App. 496; St.
Louis v. Lanigan, 97 Mo. 180; Sutton v. Dameron, 100
Mo. 141; Rogers v. Wolfe, 104 Mo. 1; Callaway County
v. Henderson, 119 Mo. 32; Meyer v. Stone, 40 Mo. App.
289; Weber v. Collins, 139 Mo. 501; Westminster College v. Piersol, 161 Mo. 270; Kinney v. Murray, 170
Mo. 708; Hamon v. Hamon, 180 Mo. 701; R. S. 1909,
sec. 2082. (2) Epilepsy is not insanity in itself. 1
Underwood on Wills, sec. 112; In re Will of Johnson,
7 Misc. N. Y. 224; In re Flensburgh's Will, 82 Hun
(N. Y.), 49; In re Rapplee's Will, 66 Hun (N. Y.), 558;
Brown v. Higgins, 94 Ill. 565; Wood v. Carpenter, 166
Mo. 486. (3) The issue of mental capacity ought to
have been taken from the jury. Winn v. Grier, 217 Mo.
420; Brinkman v. Rueggesick, 71 Mo. 553; Southworth
v. Southworth, 173 Mo. 59; Cash v. Lust, 142 Mo. 630;
Von de Veld v. Judy, 143 Mo. 348.

*William H. Wallace* and *T. B. Wallace* for respondent.

(1) The decision of the court on the former appeal (236 Mo. 523) is conclusive of the question now
presented, under the rule of *stare decisis.* It was held
on that appeal that the evidence in support of the
contestants' case was sufficient to go to the jury on
the question of mental capacity, and the cause was remanded for a new trial with directions to submit the
case to a jury on that question. The trial court has
followed the directions of this court and has submitted
the case to the jury on substantially the same case
made by the contestant on mental incapacity and a
verdict and judgment have been given avoiding the will.

Mowry v. Norman, 223 Mo. 463; Heinzeman v. Railroad, 199 Mo. 66. (2) In a will case the burden of proving mental capacity is on the proponents of the will throughout, and never shifts. Mowry v. Norman, 204 Mo. 189, 223 Mo. 463; Goodfellow v. Shannon, 197 Mo. 271. (3) The testator must have sufficient mind to comprehend the nature and extent of his property and to know what disposition he is making of it, without the aid of any other person. Holton v. Cochran, 208 Mo. 417; Turner v. Anderson, 236 Mo. 523. (4) He must have mind and memory capable of regarding and discriminating as to those who are the natural objects of his bounty and bound to him by obligations of family and blood, their deserts with reference to their conduct and treatment of him and their capacities and necessities. Roberts v. Bartlett, 190 Mo. 699; Turner v. Anderson, 236 Mo. 523. (5) Moral obligations and inequalities in the will are important circumstances bearing on the questions of mental capacity. Meir v. Butcher, 197 Mo. 68; Holton v. Cochran, 208 Mo. 417. (6) Where there is substantial evidence to support the verdict the court will not disturb the judgment. The court will not weigh the evidence for and against the will, but will examine the evidence to see if there is any testimony to support the finding. Hill v. Boyd, 199 Mo. 448; Roberts v. Bartlett, 190 Mo. 695; Goodfellow v. Shannon, 197 Mo. 271. (7) There is an additional reason why this case should have gone to the jury. The proponents of the will did not make out the usual prima-facie case by proof of the sanity of the testator by disinterested witnesses to the document. The witnesses to a will are supposed to be disinterested. A legatee is not a competent witness at common law and by the statute not competent without disclaiming the legacy. The witness, Clements, should have been left free to give his disinterested testimony, if it can be said that a man bent on upholding his own work can give disinterested testimony. For the lawyer who

wrote the will to make himself a witness is going far enough. To employ him as an attorney in the contest is going too far. Hogan v. Hinchey, 195 Mo. 534; Miltenberger v. Miltenberger, 78 Mo. 27. This circumstance of itself ought to send the case to the jury. It was held in Mowry v. Norman, 204 Mo. 192, that the fact that the will recited that the testator was free from undue influence was of itself sufficient to cast such suspicion on the transaction as to send the case to the jury.

LAMM, C. J.—In a suit in the Jackson Circuit Court the issue was the statutory one, *devisavit vel non.* All parties take under the will. The controversy has birth in that fruitful womb of litigation, to-wit, two marriages, two sets of children and a partial will largely in favor of the widow and last set, made late in life and disposing of a great estate. Plaintiff is a son of testator's deceased daughter by a first marriage, Mrs. Turner. Defendants are the widow of testator by a second marriage, two sons born of that marriage, a daughter by the first marriage, Mrs. Harvey, and a minor brother of contestant. The will has a provision cutting off any devisee or legatee contesting it. The widow and children of the second marriage are the only defendants who appeal. They contend, with reason, too, that their codefendants, Mrs. Harvey and Reid S. Turner, a minor, did not join as plaintiffs because of the forfeiture provision in the will, but cast an anchor to the windward and are friendly to the contest, though nominal contestees. Both propositions may be allowed as true.

(Note: Hereinafter when we refer to "contestees" we should be taken as meaning the appealing defendants, and when to "contestant" as using the term as a composite unit inclusive of the surviving children by the first marriage and the descendants of those dead.)

The grounds of contest were undue influence and testamentary incapacity. The issue of undue influence was taken from the jury in accordance with a ruling made when this cause was here before on appeal. [236 Mo. 523.] The case went to the jury on the issue of testamentary incapacity. The jury broke the will on that issue, as the former one did on the other. From a judgment following that verdict the widow and her two sons alone appeal.

Appellants asked and were refused a peremptory instruction coercing a verdict in favor of the will as a matter of law. The only error assigned by them is the refusal of that instruction. If, then, there was substantial evidence tending to show testamentary incapacity the instruction was bad. Otherwise, otherwise. Such is the main question in the case. Counsel argue two subsidiary ones, *viz.*: first, whether the decision in the former case was *res adjudicata;* second, whether contestees made a prima-facie case in the first instance.

The opinion rendered when the case was here before should be read with this, and the statement there made and that just made are a sufficient preliminary for appellate purposes.

We shall go deeper into the facts on the main question, the demurrer to the evidence, and sufficient of the record on the others will appear in due course.

I. *Of res adjudicata.*

On the first appeal contestees came up on a record showing that the trial court had taken the issue of testamentary incapacity from the jury, but had submitted the issue of undue influence, and the jury broke the will, as said. We were then of opinion there was no substantial evidence, direct or indirect, of undue influence. The whole of the evidence was here and properly here on the mental condition of testator. The four judges of Division One were satisfied that contestant was entitled to go to the jury on the issue of

testamentary incapacity. Contestant had won his case and, however much he was aggrieved by the action of the trial court in taking that issue from the jury, he was not "aggrieved" by the final judgment. Therefore he took no appeal. The question confronting us then was: In reversing the judgment (as we were obliged to do) what directions should we give? Should we by our own affirmative order compel the solemn probate of the will and thereby put the seal of our approval on the action of the lower court in taking away from the triers of fact the issue of testamentary capacity, or should we order a rehearing on both issues?

(1) It is argued that we had "no jurisdiction" to do anything except order the will solemnly probated, because, counsel say, the other issue was forever foreclosed as a matter of law, however much we might believe it was not a question of law but was a question of fact for the jury. Contestees' counsel in the former case took that view of it, *ore tenus* and in briefs. Contestant's counsel took the counter view. We were unanimously of opinion that we had jurisdiction to open the whole case on reversal and order a new trial generally in a will contest, and that it was our duty to do so when justice cried out for it. Accordingly, we so decided and gave the reasons for our decision on a construction of section 2083, Revised Statutes 1909, reading in part: "The Supreme Court . . . shall examine the record and award a new trial, reverse or affirm the judgment or decision of the circuit court, or give such judgment as such court ought to have given, or as to them shall seem agreeable to law."

I am instructed to say for a majority of this court In Banc that those reasons and that decision on the question of our jurisdiction, our duty and power in a will contest remain satisfactory, hence foreclose them as the law of this case.

(2) But counsel for contestant now go a step further. They argue that having once held there was substantial evidence of testamentary incapacity and that having opened the case to have that issue threshed out, such holding is *res adjudicata* on an equivalent or stronger record, as here. Learned counsel on the other side raise no serious question but that the same or equivalent facts are here, but they do not agree to the view that *res adjudicata* applies to the issue in hand. Their contention, in brief, as we grasp it, is that on the former appeal at the very most the question whether there was substantial evidence of testamentary incapacity was only *incidental* to the main question involved; that while they briefed and argued our right to *consider* it, they did not brief the question itself because of the fact that contestant took no appeal and therefore could not complain of that error, if error it was. Hence they say the question is now legitimately here for the first time for full hearing and the doctrine of *res adjudicata* is inapplicable on the reason of the thing.

It was said by a profoundly learned writer on the philosophy of the law, Dr. von Ihering: "For the law is Saturn devouring her own children." Whether that grim figure of speech was intended to apply to the lawmaker or to the judge we need not stop to inquire. Courts as a rule do not feed on their own children—allowing their "opinions" that name. Certainly it is true that in order to close litigation that would otherwise be endless, courts have invented the theories of *stare decisis* and *res adjudicata*—legal instruments bright with use, though venerable with age. The administration of justice being a practical affair, adjusting itself to work out the right in every concrete case, and not an exact science in a technical sense, those useful doctrines are of constant application as a wise device. On the other hand, as appellate courts exist for the *correction* (and not the *perpetuation*) of error,

they have reserved to themselves the natural human right to change their views and have frequently exercised that right even on the second appeal in the same case under guarded circumstances. The matter has been so lately agitated and held in solution in this court that new exposition would be unprofitable. The student of jurisprudence curious in that behalf may find its learning and philosophy considered in Mangold v. Bacon, 237 Mo. 496. We can add nothing of value to what was said in that case (*q. v.*).

We shall not in this case apply in contestant's favor the strict doctrine of *res adjudicata*. Counsel for contestees are not without some justification in refusing on the former appeal to brief the question of testamentary capacity although challenged thereto by opposing briefs. Under circumstances outlined they appeal for a reconsideration after this uncommonly persuasive fashion:

"We come to this court asking for a hearing free from all prepossession, from all prejudice, as if it approached the issue now for the first time. We ask this as a thing of common right, and we believe this court is big enough, fair enough, strong enough and serene enough to accord it to us; and in this belief we do not except the learned judge who wrote the opinion on the former appeal, and whom we certainly hold in the highest respect and esteem."

What counsel ask shall be granted them to the uttermost verge of the law, not unmindful of an ancient oath I remember to have read, taken by the judges who administered "breast law" to the simple fishermen of the Isle of Man, running this way: "By this Book and the contents thereof, and by the wonderful works that God hath miraculously wrought in the heavens above and the earth beneath in six days and six nights, I do swear that I will, without respect of favor or friendship, loss or gain, consanguinity or affinity, envy or malice, execute the laws of this isle justly

between party and party as indifferently as the herring backbone doth lie in the midst of the fish. So help me God and the contents of this Book.'' That oath carries judicial promises well worth while.

But in making that ruling and in refusing to treat the demurrer as foreclosed, we cannot very well treat as without a particle of significance the following facts, namely, (a) that the unanimous opinion of Division One at one time was that the issue of testamentary incapacity was for the jury; (b) that at a retrial a mass of evidence went in on that head and the jury (on instructions in unchallenged form) found the issue against contestees; and (c) that the trial judge, who admitted the evidence, heard it all and saw the witnesses, refused to meddle with the verdict although he had power to set it aside as against the weight of the testimony—a power denied to us. [Dutcher v. Railroad, 241 Mo. l. c. 167 et seq.]

While we are not bound by those facts on the one hand, yet we are not justified on the other in allowing them no significance at all. They stand to be reckoned with and assigned (not a controlling, but) some weight.

II. *Of a prima-facie case of testamentary capacity.*

It is argued for contestant, as we gather, that the judgment stands for affirmance because contestees as proponents of the will failed to make out a case of testamentary capacity in the first instance. The argument seems to take root in the testimony of the subscribing witnesses to the will, Dr. Twyman, now dead, and Mr. Clements. Let us attend to that. Dr. Twyman was the family physician of testator. Mr. Clements was testator's personal attorney, drafted the will, and is now the personal attorney of testator's widow, and the attorney of the administrator *pendente lite.* The argument in support of the contention seems

somewhat elusive, the facts relied on are somewhat overpressed, and the position we think is unsound, because:

Testator was born in 1836. When sixty years old, to-wit, in 1896, he was found by his wife unconscious in bed in the middle of the night. From that time on he was troubled at intervals with "spells" and convulsions. At the outset they seemed a nervous affection of an obscure kind and were thought to be referable to stomach trouble, but later they became less obscure and were diagnosed as epilepsy. In 1899, testator became the patient of Dr. Hughes of St. Louis, an alienist of celebrity, that is, a specialist in mental diseases. Testator made his first will in 1900. Three years later he added a codicil, and in March, 1905, made the will in suit, dying nine months or so later. Mr. Clements drew both wills and the codicil to the first. He knew something of those spells, knew that his client was in charge of a specialist in mental diseases. His testimony leaves us under the impression that he did not consider him "in good mental condition," but it is clear that he did consider him of sound mind and testamentary capacity and so testified. It leaves us under the impression that the family lawyer selected the family physician as the other witness to the will for the very reason that the question of testamentary capacity was in his mind, and might become an issue when testator died. Thus forewarned he deemed it best to be forearmed against coming events even then, in his mind's eye, casting their shadows before. We copy some portions of Mr. Clements' testimony abstracted in contestees' brief. Being asked why he wanted a doctor as a witness to this second will, he replied: "I knew of these attacks, these epileptic attacks, and I say I had that matter in mind in advising Dr. Twyman be asked to witness the will." Further on the witness testified, referring to the first will: "That Mr. Anderson was in sound mind, but not in

good mental condition." Having explained that he meant by "not in good mental condition" that testator was distressed over leaving for Europe on account of his health and that he was also anxious about the health of his daughter, Mrs. Turner, then on her death-bed, the witness went on to say that he knew testator was in the care of a man whose business it was to treat mental diseases and finally testified as follows (we copy, as said, from contestees' brief):

"I knew at the time I wrote this last will that Mr. Anderson had been under the care of a specialist for mental diseases for over five years, and I knew that he still had these spells. This may have had something to do with my getting Dr. Twyman. I don't know. I wanted some one whose testimony would be worth something. A man of character, and I wanted some one who would know something about his condition. Doubtless these are some of the things that influenced me in getting Dr. Twyman. I thought Dr. Twyman would know more about whether his mind was all right, probably, than I would know. I believed that he was all right, and I thought Dr. Twyman believed it."

It appears Dr. Twyman signed as a witness in his own office and that Mr. Clements and testator came there to get him as a witness. The doctor was not a specialist in mental diseases, but had had experience with epilepsy and insanity. He made no investigation at the time with reference to testator's soundness of mind, but knew he had been in charge of an alienist for some years and knew of his affliction. His testimony is very brief as to what happened. He remembers that testator spoke of his own mental condition, saying: "I am all right." The doctor testified, in effect, that testator had a sound mind at the time. On such testimony we cannot hold as a matter of law that contestees did not make out a prima-facie case. Indeed, it is not clear that counsel for contestant ask

us to go as far as that, but whether they do or not we shall not take that step.

In Cadwallader v. West, 48 Mo. l. c. 495, it was spoken of *arguendo* as of some significance that there was an investigation into Cadwallader's mental state prior to the execution of, and for the purpose of fortifying, the deed assailed. In Mowry v. Norman, 204 Mo. l. c. 192, (a will contest) our Brother GRAVES comments on the *caution* of writing into a will the phrase, "and free from all undue influences," and thereby proclaiming that fact to the world. In the drama the queen's son said to her: "Madam, how like you the play?" and the queen mother replied: "The lady doth protest too much, methinks." [Hamlet, Act 3, Cc. 2.] But all such comments smack of argument and doubtless were made to the jury, if thought worth while.

We shall not hold as a matter of law that a family lawyer or a family physician may not witness a will, nor that the testimony of these witnesses had no probative efficacy, nor that the remark of testator that he was "all right" is conclusive against his being of sound mind. There is no question here of the integrity of these witnesses or of their intelligence. Their relations with testator, their opportunities of observing him and their knowledge of his condition, their candor and good faith, undoubted so far as we can see, went to their credibility and were for the jury to weigh and stamp with a proper per cent of value.

May not an attorney make and try to sustain the same will? Even if it be better to have a witness to the will not interested in sustaining his own handiwork, yet may not an attorney serve as one, handicapped with professional interest as he is—his *interest* being for the jury? If an attorney would first make and then try to break the same will we would have another case before us. As sourly put by distinguished counsel in another case, a professional sign would read badly with this legend emblazoned thereon: "Blank and Blank,

Attorneys—Wills Made and Broken—No Objection to Making and Breaking the Same Will.''

The point is disallowed to contestant.

III. *Of testamentary incapacity (and herein of the demurrer to the evidence).*

At the close of the case contestees were refused an instruction in the nature of a demurrer to the evidence and coercing the solemn probate of the will. There is no question here on the other instructions and none on the pleadings or the admission or exclusion of testimony. The sole remaining question, then, has come to be this: Did that demurrer lie? Ought we to say as a matter of law there was no substantial evidence tending to show testamentary incapacity?

(a) Before disposing of that main question there are some general observations in point, thus:

(1) There seems to be an idea abroad that in a will contest an appellate court approaches the proof from the standpoint of a chancellor and will weigh the evidence and decide the case as if in equity. But that view is a heresy. A statutory will contest is a lawsuit pure and simple and has the characteristics of its kind. True it is *sui generis.* It has its peculiarities in burden of proof, in order of proof, in opening and closing, in the absence of a right of dismissal without a solemn probate or rejection of the will and in its freedom from cost bonds. But none of these peculiarities in anywise affect the proposition that a will contest is treated by an appellate court strictly as a lawsuit. Hence it leaves to the jury the office of weighing the evidence, and to the trial court the exclusive office of setting aside a verdict because against the weight of the evidence. It follows that on demurrer to the evidence it restricts itself to its normal function of determining whether or not there was (not a *scintilla,* but) substantial evidence to go to the jury

Turner v. Anderson.

on the issue   [Wendling v. Bowden, 252 Mo. l. c. 692;
Teckenbrock v. McLaughlin, 209 Mo. l. c. 538 et seq.;
Mowry v. Norman, 204 Mo. l. c. 193.]

(2) Courts are fond of sustaining wills. The right
to dispose of one's own property, the *jus disponendi*,
stands now as always on the solidest grounds as one
of the landmarks of the law and is not to be frittered
away by piece-meal or indirection. Courts are not blind
to an itching in juries to break wills, to make them for
others, to act as if they thought they knew how he
should divide his property better than did testator
himself. Hence, a line of cases may be found in this
jurisdiction (and we have no bone to pick with them
as a class) showing a drift along the line of sedulously
guarding against that tendency, and of correcting ver-
dicts attributable to it with a firm hand. To this end
the rule is that when the issue is undue influence or
testamentary incapacity, the proofs educed in support
of those issues are searched with a critical eye. As
they deal with psychological inferences, they are sub-
mitted to the severest tests of reason to see whether
they furnish a substantial basis for a finding in the
affirmative and breaking the will. But after all is
said in that behalf that can be well said, it still re-
mains true that, given contestees' demurrer to the
evidence in a will contest, as here, it is to be judged
by the general rule applicable to similar demurrers
in other lawsuits. That rule runs as follows (*vide*,
Williams v. Railroad, 257 Mo. l. c. 112):

"On demurrer, a defendant's testimony (where
contradicted) is taken as false; a plaintiff's (where not
self-evidently perjured or opposed to the physics of
the case) is taken as true. Contradictions between
witnesses or self-contradictions by a witness, together
with the credibility of witnesses and the weight due
their testimony, are for the jury, not the court. So
it is for the jury to reconcile differences and iron out

the wrinkles of vagueness or discrepancy, if any. So, the court must allow to a plaintiff's case on defendant's demurrer the benefit of every reasonable inference of fact arising on all the proof. [Fritz v. Railroad, 243 Mo. l. c. 77; Stauffer v. Railroad, 243 Mo. l. c. 316.] 'The party demurring admits the truth of the testimony to which he demurs, and also those conclusions of fact which a jury might fairly draw from that testimony. Forced and violent inferences he does not admit, but the testimony is to be taken most strongly against him, and such conclusions as a jury might justifiably draw the court ought to draw.' [Per MARSHALL, C. J., in Pawling v. United States, 4 Cranch, 219; Pleasants v. Fant, 89 U. S. (22 Wall.) l. c. 121.]''

(3)   From such postulates the following conclusions spring, to-wit:

In the first place, it is but confusing the issue on demurrer to the evidence in this case to canvass the proofs educed by contestees to sustain the will, where, as here, there was substantial countervailing proof on the part of contestant. It may stand conceded that contestees introduced cogent evidence supporting the testamentary capacity of testator. The record shows that to be true and the concession is justified. But that concession neither settles nor helps settle the question of law on demurrer. Its force was spent below on the jury.

In the second place, on demurrer we are concerned alone with the admitted facts and with the tendency of contestant's reasonable and material proof (whether contradicted or not by contestees').

The two fundamental propositions just laid down are vital and, through inadvertence it would seem, are not always heeded. It is as clear as can be that if on defendant's demurrer to the evidence an appellate court on defendant's appeal permits itself to be controlled by defendant's controverted testimony, such court at once usurps the preclusive office of the jury.

It strikes down the jury's right to believe or disbelieve. Accordingly in a case of this kind, hanging on the sole thread of a demurrer, to even bask in the sunshine of demurrant's contradicted testimony is to put the judicial mind in the way of being seduced somewhat as Samson fell by lying in the wrong lap.

In the next place, the bill of exceptions covers over 1000 pages of typewriting. Contestees' abstract, condensed as it is into narrative form (which fact we commend), covers between 400 and 500 pages. It would extend this opinion to bounds sounding to folly to undertake to reproduce here the whole of the evidence on the issue of testamentary capacity. Moreover, to take a bit of evidence here and a bit there from this witness and that—bits torn from explanatory context, the thread of the witness's discourse—I deem unphilosophical and misleading in so heavy a case weighted down as it is with infinite details. There is danger in that course of merely amplifying the *fallacy* of *accent* mentioned in books on logic. Every school boy knows some of the trite examples, for instance: If "him" and "neighbor" were underscored in the biblical sentences: "Thou shalt not bear false witness against thy *neighbor*," and "And he spake to his sons, saying, saddle me an ass, and they saddled *him*," a singular perversion of sense at once illustrating the mischief that may lurk in the fallacy of accent so made apparent. Now, accentuating bits of evidence by reproduction and parading those disconnected bits is subject to the same mischief on a larger scale. If space and time permitted a fair summary of each witness's testimony, another situation would arise. Here there was a cloud of witnesses and that course is impracticable.

Accordingly we shall mention (and give our conclusions on) the ultimate facts either admitted in the case or which contestant's material testimony tended to prove as courts have done from times immemorial.

With these observations we come to those facts.

(b)    Testator, himself a small farmer at the time, married a neighboring farmer's daughter, who died in 1887, leaving two children, daughters. One, Kate, married Mr. Turner and died of consumption, leaving two sons, parties to this suit. Testator was indifferent to Turner—the cause must be left to conjecture. The record is barren of any testimony furnishing a rational basis for an estrangement on his part from his daughter, Mrs. Turner, or from her children, his grandsons. We use the term "rational" designedly to exclude caprice or whims. The other daughter, Nellie, now Mrs. Harvey, was seven years old when her mother died, and lived in her father's house while he was a widower, to-wit, until 1890, say three years. Though he was then a man of affluence, he consented two weeks after that event that Nellie might leave his home to live with her aunt, testator's sister, for a time. That was the end of her home life. She, when young, was sent to a ladies' boarding school in Lexington for two years or so. Married while under twenty, her father refused his advice on the question of marriage, leaving her to make up her own mind and do as she chose, but evidently he did not look kindly upon it. The marriage was unfortunate. While in her teens and before her marriage she sought to return to her father's house, but he advised her against it, and she never again was one of the household. Indeed after leaving her aunt and school she had no home in a just sense, lived here and there, her father supporting her. She separated from her husband in a few months after marriage, her father aiding her in procuring a divorce. Her life seems to have been full of sorrow and misfortune, but we look in vain in this record for any rational cause for his dealing harshly with her, and for any rational cause for his entertaining aught but sympathy and fatherly affection for her. She married again, bore a child and there are record indications she was in needy circumstances when the will was made, as before and

since. Testator remarried, as said, in 1890. Two sons, now living and parties to this suit, were born of that marriage. Preparatory to going to Europe in 1900 with his wife and her children and with Dr. Hughes, the alienist hereinbefore referred to, he made a will. That will was more beneficial to his children by the first marriage than the will in suit. After providing bountifully for his wife and her two sons, he divided the residue of his estate into five parts, giving his wife one part, each of her two sons one, to Nellie one, and Mrs. Turner one. Mrs. Turner having died during his absence in Europe, three years later he made a codicil giving the Turner boys their mother's said share, and (having acquired fifty acres of land since the will was made) he gave that to one of the sons of his second wife. In 1905, he, being then about seventy years of age, made a second will. By that he disposed of an estate estimated at $310,000, in lands, houses, bonds, stocks, loans, cash. By its provisions the second wife took property of the value of $88,000; her two sons each the same amount, aggregating $176,000; the daughter, Nellie, $35,000; and his grandsons, the Turner boys, $5000 each. The inequalities in the will speak for themselves. We find no dependable estimate of the amount of the estate when the first will was made. It is contended by contestant's counsel that it was practically of the same amount at the date of both wills. Counsel for contestees do not agree to that. The best we can make of it is that the difference, if any, was not large.

Going back a little to take up the dropped thread of the personality of testator and bring it forward as part of the warp and woof of this case, it appears that he early laid the foundation for a great fortune. At least before disease laid its heavy hand upon him he had a business farsightedness, a power of getting and holding money above the average man, even the successful man. He was of fine physique, weighed, say,

two hundred pounds, an attractive personality, had the confidence of his community, held for years the lucrative office of collector of revenue, thereby acquiring an accurate knowledge of local land values—a knowledge essential to the safe placing of loans in country regions in Jackson county and such investments he largely made. He organized a national bank at Independence and was its president until the day of his death. From the humble position of a small farmer and wood hauler, he, before making any will, had won his way to a pronounced business success, as "success" is spoken of conventionally. So much is undisputed on this record. It may be taken as conceded, too, that he was a proud man, a reticent and self-contained man in his prime. He was not given to sentiment or a large flow of affection and it may be that the qualities of hardness and sternness predominated. Seemingly throughout that business prime he was absorbed in the close pursuit of money and it is a just estimate of the record to say that this was a quality so much accentuated in the last few years of his life that it became a ruling passion amounting to almost, if not quite, *avarice*. In fact, learned counsel for contestees, if we did not miss the thread of their argument at our bar, sought to explain some of the transactions in evidence as taking root in that unlovely quality of mind and heart rather than in an unsound mind.

We now come to a group of facts more directly connected with the issue of testamentary incapacity. One of them, a main and master fact in the case (and one we stress) stands conceded with others, to-wit, that testator for ten years prior to his death was in the grasp of an insidious and dread disease, epilepsy, a disease properly classed as a mental disease. It was incurable in this case, as it always is apparently, and baffled the skill of the most experienced alienists. It seems to be the consensus of opinion that it is a progressive disease when it seizes its victim in old age, as

here. It was so in this instance and while apparently arrested somewhat at one time, yet it gathered headway again later on and ran its fatal and inevitable course. Added to that disease, testator suffered from an aggravated hernia. About nine months after making the will in question he submitted to a major operation for hernia, was seized with an epileptic convulsion without fully recovering from the anaesthetic administered, and died of apoplexy superinduced by that convulsion and without recovering consciousness.

The medical experts who testified were not in accord on the question of the origin of epilepsy or its seat, or its necessary effects, nor is it worth while for the purposes of deciding this case to enter that vexed field. The case may proceed on the theory that epilepsy in and of itself is not necessarily a permanent state of insanity, nor is it technically insanity at all. We take it when a fit of *grand mal* is on, as one form of epilepsy is called, or even when a fit of *petit mal* is on, as another form is called, there comes a time immediately before the fit and during its existence and after the crisis is passed (and its victim is recovering) that there exists a state of mind all would agree constitutes an entire or partial blankness, confusion or arrest of the mental faculties spelling testamentary incapacity. In this case contestant put in no proof showing that the will was made at such particular time; contestees' proof affirmatively showed the contrary. The real question, then, is whether the disease had created such a *permanent* mental condition as made the question of testamentary capacity at the point of time the will was executed a question for the jury. Now on that question, as indicated heretofore, contestees introduced cogent evidence tending to show that the mental and moral faculties of testator had not been so permanently impaired that a state of testamentary incapacity existed. If that evidence is to control us as a matter of law, the demurrer was badly ruled. But, as

heretofore pointed out, the stiff guiding rule on demurrer will not permit the case to break on the evidence of the unsuccessful contestees where there was competent contradictory and cogent evidence on contestant's part tending to prove testamentary incapacity. Attend to our impressions and conclusions on the tendency of contestant's evidence on that score, arrived at from a painstaking study of the record.

There was medical evidence from one doctor tending to show that epilepsy has a depreciating effect on the mind. That doctor put the matter this way: The more "spells" a man has the weaker his mind becomes. Epilepsy is a brain disease, a change in the cells some place in the brain. Another expert gave testimony tending to show that some medical authorities put *petit mal* as more injurious to the mind than *grand mal* and some less so. His own observation was, equally so, that is, there was practically no difference in the damage to the mind in the patient who suffers repeated attacks of *petit mal* and one who suffers attacks of *grand mal*. Attacks at long intervals were not as bad as at frequent intervals. Other expert testimony tended to show that epilepsy, coming at old age in connection with arterial sclerosis, as it does, is incurable and progressive. The victim of such epilepsy can not have a spell unless there is something wrong before; the spell or fit does not throw off the sclerotic condition; the brain is diseased just the same and stays in that way until there is another spell. The disease is in the arteries or blood vessels of the brain. The witness, the tendency of whose testimony we are now following, stated that the memory of the epileptic is affected; next there comes a change in his will power. These changes may come in two, three or ten or twelve years—there is no rule about it. That the attention is affected earlier than the moral faculties. Next comes the lessening of the patient's perceptive powers, his ability to grasp situations and facts. At that stage

comes deterioration in power for mental work and later his moral sense is affected. In late stages, if the victim of epilepsy be an old man, he may not properly distinguish his duties to the members of his family. No hard-and-fast rule can be given. Each epileptic case is a study to itself, and it would not be possible to give the number of years in which those respective changes occur. There was testimony testator was suffering from senile epilepsy, and experts in describing the natural course of the disease, said it consisted in changes of the brain and circulation. The blood vessels become rigid and hardened. The framework of the brain enlarges and the brain really becomes smaller. These changes may also affect the blood vessels of the kidneys or the heart. The seat of the mind is in the brain, and in those old-age changes mentioned and connected with epilepsy the mind becomes weakened, convulsions hasten that condition and mental changes occur gradually. The faculty of attention, as said, is affected. The patient is unable to fix his mind very easily on a subject for any length of time. Memory of recent events is affected very much. The will and judgment are affected. In fact, all the faculties of the mind upon which moral actions are based and all the emotions are affected. The ethical sense is weakened as well as the moral sense, that is, the sense of right and wrong. These brain changes are permanent and get worse and worse in senile epilepsy. The cells of the brain shrink and shrivel in its progressive form, and if a person lives long enough he would not have any mind at all; he keeps going down and getting weaker all the time.

We are of opinion there was substantial medical evidence tending to show that testator was afflicted with the kind of epilepsy we have outlined. He had both *grand mal* and *petit mal* for, say, ten years before he made his last will. On hypothetical questions some

of the expert testimony was to the effect that testator did not have testamentary capacity.

Recurring now to contestant's lay evidence, there was testimony of that same kind strongly tending to show testator had a typical and established case of senile epilepsy, agreeing therein with the expert testimony. Many instances of convulsions, some *petit mal,* some *grand mal,* are described and, as we read the record, they grew more and more frequent in the last years of his life. The details of these convulsions covered such phases as blankness of countenance, jerking, twitchings and other facial changes, unconsciousness, falling to the ground, frothing at the mouth and the whole sad category of epileptic phenomena. Testator, it is admitted by contestees, "never talked about his infirmity and so far as he could, concealed its existence," and yet so many convulsions are described by contestant's witnesses (casually seen at chance times and places) that it is beyond all reason to suppose there were not many they did not see and which, in the complete history of his case, might have to be reckoned with as having a cumulative effect. So, too, the effect of his epilepsy manifested itself physically. He was a sick man, "feeble," "pale," "weak" and fell off greatly in weight. That his mind was actually affected, and in a marked way too, there can be little doubt if contestant's testimony is to be credited with the weight seemingly its due. This manifested itself in inability to control his emotions; in inability to fix his attention on a subject for any length of time, even in business matters in which formerly he had been proficient and eager; in a singular forgetfulness in current and important business matters, in business orders and directions, and even in forgetfulness of the existence of large loans due him. Taking his native hue and normal bent of mind, deep-set on gainful accumulation, the last fact permits emphasis. It manifested itself in the fact that he had lost confidence in his own

judgment in management of important features of his business and what judgment he had in business under his exclusive charge seemed in some instances whimsical and poor—we refer to his farming operations, his sale of stock, farm implements, etc., the whimsical and unbusinesslike character of his later leases, etc. Moreover this man had delusions. For instance, among others: He saw debtors when none existed. He would dun people for debts who never owed him a penny, or had a money transaction with him; he (contrary to the fact) came to believe he was born in the house his first wife was born in; he thought the homestead of her birth was the homestead where he was born, and so on. So, too, his ethical sense was so impaired it seemed to run low with his first children. For instance: He, an affluent father, took many notes from his needy and unfortunate daughter, Nellie, for small amounts of money loaned her for her support and charged her in some instances eight per cent compound interest, this when he was loaning money at six per cent (and in at least one instance at three per cent) to others. He had in his hands for a long time for his two daughters by his first marriage, money coming to them from their mother's estate, say $5000. If the evidence is to be credited he paid them this money without any interest at all, and over their protestations. One of them, Kate, was facing inevitable and known death from consumption at the time this hard and unfatherly settlement was driven through. There is evidence she was in tears over it, and when testator was at once appealed to by a neighbor woman who was spurred thereto by those tears, he assured this neighbor he was going to "fix it all right," that he had *promised* his daughter to "make her children equal with the rest of my children." If this solemn promise was made, and the jury had the right to believe it was, we have a broken promise, one in its dramatic settings and sacredness almost rising to

the dignity of the vow of antiquity; for it was not kept either presently or at any time—witness the will made immediately thereafter and the one made ten years later.

There was testimony from contestant's lay witnesses, intelligent and disinterested men so far as we can see, who had opportunities of observation and who made observations, tending to prove facts warranting their opinion evidence. That opinion evidence they gave to the effect that testator's mind was permanently affected in the last few years of his life. If this testimony is entitled to credit, he was not of sound mind at the time of the execution of the last will. The credibility of these witnesses was not directly impeached nor was it destroyed on cross-examination.

In the former opinion in this case (236 Mo. l. c. 544), it was said: "He kept a great estate to the end, but he had powerful aid in competent agents. Under some of the testimony, his personal attention to and knowledge of his affairs and property were of such sort toward the close as indicated a wandering and weakened mind—a mental reckoning lost." That conclusion is brought to book by counsel for contestees and its accuracy sharply challenged. We have gone over the present record with an eye to that challenge, and as we thought then, so we think now, to-wit, the observation was just. Testator's business may be divided into two classes. In one he had personal charge, in the other he did not. To the first class belong his farming operations. In regard to them his business judgment was not at all what it had been before he was broken by his affliction. His farm ran down. The energy and good sense of its early management were lost. Leases (or more accurately, farming contracts) drawn by him were full of whims, inconsequential features were accentuated, and main features looking to good husbandry and sensible results were pretermitted or obscured. Some of the narrations of these leases

were incoherent and the net result of his farming operations (carried on with whimsical orders, forgotten when executed and changed about without reason) by no means establish a rational mind in business, to my way of thinking. Coming to the other class, to-wit, his banking and loan business, the success of both features may be conceded. But there was testimony the jury was justified in believing that, while he was president of a bank to the day of his death, yet finally he took no intelligent or active part as an adviser in its business affairs, nor was he expected to for several years before his death. Under such circumstances while to remove him as president was unnecessary, yet to keep him as president amounted to no more than having him as a figurehead—we use the word in no offensive sense. As to his loan business, it may be said that he had no bad loans, and yet, he had a large investment in the line of real estate loans. But there are record indications that the only substantial office filled by him in connection with these loans toward the close of his career was that his judgment was asked by his attorney on the value of offered landed securities. Such request was natural and the fact not controlling. These loans were to all intents and purposes procured and made under the supervision of Mr. Clements, his attorney—a great aid, indeed. Loan papers were kept in the bank. The aid of the officers of the bank was given when required in the collection and computation of interest. Hence, we say again, as we said before, that he had great aids in the preservation of his estate.

In a case where a demurrer to the evidence was held to lie, PHILIPS, C., in speaking for this court, made the following apposite pronouncement (Jackson v. Hardin, 83 Mo. l. c. 185 et seq.) :

"As neither courts nor juries can make wills for men they ought to be careful in unmaking them. We are not unmindful, in upholding the action of the court in taking this case from the jury, of the great impor-

tance of the trial courts not trenching upon the rightful province of the jury to determine and judge of the facts. Where there are facts established from which the jury may reasonably draw legitimate inferences tending to sustain an issue, the court should not interfere. But where the evidence is of that character that the trial judge would have a plain duty to perform in setting aside the verdict as unsupported by the evidence, it is his duty and his prerogative to interfere before submission to the jury and direct a verdict for the defendant.''

In Furber v. Bolt & Nut Co., 185 Mo. l. c. 311 et seq., VALLIANT, J., speaking for this court, said:

''In considering whether or not the plaintiff was entitled to go to the jury on this specification we must give him the benefit of every conclusion that could lawfully be drawn from his own evidence, aided, if it is aided, by the evidence of the defendant. Where the evidence of the defendant contradicts that of the plaintiff a question is presented for the jury, not for the court. Yet when the court is asked to authorize a jury to find a fact from the testimony so vague and uncertain that the inference to be drawn from it amounts to scarcely more than conjecture of the possibility that the fact might exist, then the court ought to look at the character of the evidence on the other side and if the case is such that the verdict for the plaintiff would necessarily have to be set aside, the court should not submit the question to the jury.''

There is nothing in either of those cases militating against the rule laid down in this opinion under subsection a, this paragraph, from the Williams case, supra. In speaking to the question the writers of those opinions were merely approaching it from a different angle. When rightly understood by proper analysis equivalent doctrine is announced by all. This court did not mean in the Furber case that where there was substantial evidence tending to prove the cause

of action stated in a petition, we could go to defendant's contradicted evidence in ruling a demurrer. What it said was on the hypothesis that plaintiff's evidence could be classed as mere conjecture or as creating a mere possibility, and if that were so then you could go to the defendant's evidence. In such case defendant's evidence would be practically uncontroverted, and hence to be reckoned with on demurrer under the rule in the Williams case.

So that, admonished and quickened by acceptable doctrine governing the ruling of demurrers to the evidence at the close of the case, we are of opinion the demurrer in this case was well ruled.

Harsh and unnatural wills may stand. We have been fond of saying that the very object of making any will at all was to let the distribution of the estate flow in channels outside of the general Statute of Descents and Distributions. Mere inequalities in a will, therefore, do not impugn it, nor, standing alone, are they sufficient evidence of testamentary incapacity, when that is in issue, or undue influence, when that is in issue; but when there is other competent and substantial proof of testamentary incapacity or undue influence, then the rule is that unnatural or marked inequalities in a will, based on no reasonable ground, are factors to be reckoned with on either issue in combination with other testimony. Such factors are here and the demurrer seeks them.

Testamentary incapacity is a psychological phenomenon. Witnesses testifying to unsoundness of mind are dealing with psychological inferences. In that class of inferences error may easily lurk. Hence the caution of courts, hence the strictness with which courts examine such testimony to see if it bears the hallmark of reason, to see if the facts postulated by the witnesses rationally warrant the inference. Cases may be found that possibly go too far in taking the issue of fact from the jury. If so they are attributable to

judicial zeal in protecting the right to make wills, to give rounded effect to the Statute of Wills, and to strike down the mischief of unmaking them except on solid grounds. The pestiferous notion that where there is a will there is a way—to break it, is not the doctrine of this court (Story v. Story, 188 Mo. l. c. 128) and that mere oddities and eccentricities combed together and not necessarily referable to seated aberration of mind are not sufficient in law to break a will, however artistically selected, arranged and paraded, is a theory we have never departed from.

It is possible that in our later decisions we have receded somewhat from the extreme lengths of some older cases. Be that as it may, after three full arguments by distinguished counsel, twice in division and once before the whole bench, supplemented by a patient study of this record, we have come to the conclusion that the issue of testamentary incapacity was for the jury. That conclusion we consider well within the facts and reasoning of a line of cases of which the following are but examples: Roberts v. Bartlett, 190 Mo. 680; Meier v. Buchter, 197 Mo. 68; Holton v. Cochran, 208 Mo. 314; Crum v. Crum, 231 Mo. 626; Mowry v. Norman, 204 Mo. 173, 223 Mo. 463; Turner v. Anderson, 236 Mo. 523; Wendling v. Bowden, 252 Mo. 647.

Each and all of the premises considered, we shall not interfere with the judgment. Accordingly it is affirmed. All concur except *Bond, J.*, who dissents in an opinion filed.

## DISSENTING OPINION.

BOND, J.—This case was transferred to Banc upon an opinion written by me in Division One, which was not concurred in by the other members of that division.

My individual opinion contains a full statement of the issues and a complete synopsis of the evidence bearing on them.

The only isue presented by the present appeal, is whether the testator had mental capacity to make a will.

The case was here on a former appeal from a judgment in the trial court against the will on the issue of undue influence.

On that trial the circuit judge of his own motion took away from the jury the issue of mental capacity and the contestant did not then except to that ruling, but abided judgment in his favor on the other issues. The defendants appealed from that judgment and this court upon a review of that appeal decided there was no evidence tending to prove undue influence in the record and remanded the cause with directions to the circuit court to submit it to the jury upon the issues of mental capacity. On the second trial the contestant again had judgment against the will, from which the defendants have appealed to this court on the ground that there is no substantial evidence in the record justifying that judgment.

The contestant in this case is one only of the two grandchildren of the testator, whose remaining grandchild, his daughter, his two sons, and his wife are all defendants. The maker of this will was M. W. Anderson. It was written according to his direction on the 29th of March, 1905. Within a year thereafter he died at the age of 69.

He was twice married, his first wife dying in 1887, leaving two daughters, Nellie Harvey and Kate Turner, the latter dying before her father and leaving two sons, one of whom is the contestant in this case. Three years thereafter he married again. His second wife survived him, as did two sons born of that union, Henry Clay Anderson and M. W. Anderson, aged ten and fourteen years at the death of their father. His widow, his three children and one of his grandchildren are the defendants in this cause; the other grandchild is the solitary plaintiff.

260 Mo.—3

The will of the testator gave his residence, household and kitchen furniture to the surviving wife and bequeathed to her a government bond for $10,000, and some cash. The will then gave to each of his sons certain lands and personal property and bequeathed $5000 to each of his two grandsons, who were the sons of this deceased daughter, Mrs. Turner. The remainder of his estate is devised in equal shares between his wife and two sons and his daughter, Nellie Harvey. His wife was made executrix without bond.

The testator was born and reared in Jackson county, Missouri. He held various offices, and in 1889 was one of the organizers of the First National Bank of Independence and was its president at the time of his death. He was a man of affairs, of great vigor of mind and body, until about ten years before his death, when he became subject to periodical attacks of epilepsy of both the slight and severe kind. In 1899, he placed himself under the treatment of a specialist in mental and nervous diseases, and in the following summer, accompanied by his family and his physician, he spent several months traveling abroad, and had no attacks of his malady during that trip. Upon his return he was accustomed to go to St. Louis every month and spend a week under the care of his specialist. This he continued until 1905, when he considered himself well and ceased these visits. When he had an attack of the milder form he would not fall to the ground. When the attack was one of the severe kind he would fall and become unconscious. The doctors termed these two types of the disease to be little sickness and great sickness. Neither of them prevented him from going about unaccompanied, nor from transacting his business.

He had made a will prior to the one in controversy and had added a codicil to it. He called to see his attorney prior to the making of the present will with reference to some alteration of the disposition of his

former will and codicil thereto. His attorney suggested to him that it would be better to make a new will. He thereupon gave the attorney directions as to the draft of the will and assisted in pointing out to him the location of the lands devised thereunder, and showed him some of the bonds bequeathed. After the will was drawn in accordance with his directions he took it home and kept it over night and brought it back, saying to his attorney that he wanted a clause put in the will to the effect that if it was contested by any legatee or devisee, the interest of such contestant should thereby lapse and become a part of the residuary devise in his will. This clause was inserted and thereupon the testator and his attorney went to the office of Dr. Twyman, his family physician for many years, and at the request of the testator, these two became witnesses to the will.

The testimony of those two witnesses was that at the time of the making of his will the testator was of sound and disposing mind.

## I.

Before reviewing the testimony, it is proper to announce the rules of law governing cases like the present.

There are two kinds of insanity or mental derangement; first, that which is temporary or intermittent; this may arise from various diseases; second, that which is habitual or permanent, which however caused, deprives the subject of the power to contract during its continuance. The party who alleges the first sort in avoidance of an act, must bring his proof of mental incapacity to the *point* of time when the act complained of was done and must not stop at an earlier period, for there is no presumption of continuance of this kind of insanity. [Buswell on Insanity, sec. 190; Richardson v. Smart, 65 Mo. App. l. c. 19, and cases cited.]

On the other hand when the second sort (chronic insanity) has been proven, or admitted to have existed at any particular time, the law presumes its continuance, and a party who alleges that a subsequent act was done in a lucid interval, must prove that mental capacity existed at the time of the act. And this requirement is not discharged by evidence of sanity before or after the date of the act. But in making proof of sanity at the *time* of the performance of the act it is not necessary to show that the mind of the subject was restored to its original state. It is sufficient to prove competence on his part for the common purposes of life. [Creagh v. Blood, 2 Jones & La. T. 509; Buswell on Insanity, sec. 189.]

When a will is contested in this State, the defendants or the proponents of the will must prove its execution and that the testator was sane at the time and of lawful age. This establishes a prima-facie case in favor of the will and entitles it to probate unless the contestants shall adduce substantial evidence tending to prove mental incapacity of the testator or undue influence exerted over his mind, *at the time* of the making of the instrument. If such evidence be adduced by the contestants the issue raised thereby must be left to the jury. [Southworth v. Southworth, 173 Mo. l. c. 72, and cases cited.]

One is competent to make a will who understands the act he is performing, the extent and kind of property he owns, the manner in which he disposes of it, the beneficiaries of his will and the persons who are the natural objects of his bounty. Possessed of that degree of intelligence, a man may make a valid will under the laws of this State, although his memory may be impaired by sickness or old age, and he may have forgotten the names of persons formerly known or things said to him, "or may be incapable of making a contract or managing his estate." [Benoist v. Murrin, 58 Mo. 307; Brinkman v. Rueggesick, 71 Mo. l. c.

556; Couch v. Gentry, 113 Mo. 1. c. 255; Farmer v. Farmer, 129 Mo. 530; Berberet v. Berberet, 131 Mo. 399; McFadin v. Catron, 120 Mo. 252; McFadin v. Catron, 138 Mo. 197; Cash v. Lust, 142 Mo. 630; Riley v. Sherwood, 144 Mo. 354; Fulbright v. Perry Co., 145 Mo. 432; Southworth v. Southworth, 173 Mo. 1. c. 72; Winn v. Grier, 217 Mo. 1. c. 454; Sayre v. Trustees of Princeton University, 192 Mo. 95; Weston v. Hanson, 212 Mo. 1. c. 270; Hayes v. Hayes, 242 Mo. 1. c. 169.]

The clear and complete proof of the mental capacity of the testator at the *very time* of the execution of the will in controversy, and the total absence of any evidence on behalf of the contestant to the contrary will entitle that instrument to be probated unless we can find, in the present record, some substantial evidence that the testator was afflicted with prior chronic and continuous insanity, and therefore presumptively insane at the time of its execution. If there is any evidence in the record which tends to establish such a state of mind, then there was a question for the jury, and this being a statutory and legal action their finding against the will is conclusive on us, since no errors are assigned as to the instructions of the court or admission of evidence. But it will not avail respondent in this case to point to evidence in the record tending to show that the testator prior to the making of his will suffered from temporary or intermittent insanity caused by epilepsy. For the rule is, that such malady *is not presumed to continue,* and that a party relying on it to defeat a will or contract, must bring proof that it was operative on the mind of the subject at the *very time* of the doing of the act, sought to be avoided.

There is not a gleam of evidence in this case that the testator had a recurring attack of insanity arising from epilepsy or other cause at *the time* he executed his will, nor *within several weeks of that event.* If that instrument was executed by him when insane, then

that fact must be a legal and logical deduction from some substantial evidence in this record tending to prove prior, general and continuous insanity on his part, of such a degree as to deprive him of the power to make any civil engagement or perform any rational act. This necessarily limits and narrows our view of the testimony to such parts of it as may tend to prove *habitual and permanent insanity* on the part of M. W. Anderson before making his will.

In my divisional opinion I set out *in extenso* both the testimony of the experts and the non-experts relied on by contestant. There is no necessity to repeat that testimony. Dr. Hughes, the only one of the experts who gave the testator any treatment, testified fully as to the state of his patient until he ceased to come to him for further treatment. This expert stated in conclusion, to-wit: *"Up to the time he quit, his mental faculties were good, normal. I didn't see anything abnormal about him."* The other three experts simply gave their theories as to the nature of epilepsy as a disease. None of them stated that it was insanity and all of them conceded that an epileptic could, when not under the influence of the disease, act with intelligence and discretion, in any matter of private or public business. And this conclusion is also the result of universal observation and of the rules announced by the textbooks as well as the decisions of the courts of last resort, here and elsewhere. A few of these will be noted.

In a case before the Supreme Court of Wisconsin it was shown that the testator made his will on the day after an epileptic fit, and within a few minutes after making the will he was taken with another fit, and died a day or two afterwards, and that court held that these facts did not show want of testamentary capacity, since it appeared he was in possession of his faculties when he executed the will. [In re Lewis's Will, 51 Wis. l. c. 110.]

. So in Illinois it is said: "The proof of periodical epileptic attacks attended with convulsions, loss of consciousness, and the usual sequence of such attacks, or proof of temporary pneumonia supervening such an attack, with fever and delirium, is not such proof of insanity or lunacy as creates the presumption referred to in this instruction." [Brown v. Riggins, 94 Ill. l. c. 569.]

Likewise in New York it was held: "But it was shown that he at times had epileptic fits, and after such a seizure he became, for two or three days, weak in mind as well as in body, so that he failed, at such times, to recognize his son-in-law and others. But when he recovered from such attacks his mind again became clear and strong, and he would resume his usual avoca· tions. The will in question was made by him *after* one of these epileptic convulsions, and when no fact or circumstance is shown to exist bringing into doubt his ability to make a will. Without evidence of his want of capacity, at *that time,* or at a time *near* it, *no case can be said to have been made out by the contestants.* It is not disputed but that the testator went voluntarily and at his own suggestion to the county seat of Yates county, there to have prepared and executed his last will, and that he gave particular instructions in regard to the disposition which he desired to be made of his estate." [In Rapplee's Will, 66 Hun (N. Y.), l. c. 561.] To the same effect: In re Johnson's Will, 7 N. Y. Misc. l. c. 224; 1 Underhill on Wills, sec. 112; Buswell on Insanity, sec. 190. Finally in our own State (the case of Wood v. Carpenter) the testator was over *eighty* years of age  There was evidence that he had epileptic fits *after* making his will, and the plaintiff in the suit to contest his will and her husband, testified that he had these fits *before* the will was executed. This court said that a verdict against the will was without any substantial evidence to support it and re-

manded the case with directions to establish the will. [Wood v. Carpenter, 166 Mo. l. c. 486.]

The correct rule is, that epilepsy is not in and of itself insanity, nor does it render its subjects incapable of normal and intelligent action except during the period of the seizures or at a time before or after, when the mind of the sufferer is still under the dominance of the disease. It may become insanity when, either from the violence and frequency of the attacks, or by complication with other ailments, it acquires sufficient power to destroy the mind of its subject. *There is no evidence in this record that either of these conditions existed prior to the making of the will of the testator.*

## II.

Now as to the lay witnesses. Aside from New York and Massachusetts, and a few other eastern States, the American rule, like the English doctrine, is that nonexpert witnesses may give their opinions as to the insanity of the maker of a will or of the defendant in a criminal proceeding. But they can only do so in connection *with a statement of the grounds of their opinion,* which must embrace "facts" existing within their knowledge and observation. They can express no opinion whether a hypothetical state of facts would be evidence of insanity. Neither can they express an opinion upon evidence which they have heard other witnesses detail. [Farrell's Admr. v. Brennan's Admx., 32 Mo. l. c. 334; State v. Erb, 74 Mo. l. c. 205; State v. Speyer, 194 Mo. l. c. 468; State v. Klinger, 46 Mo. l. c. 229; Cram v. Cram, 33 Vt. 15; 17 Cyc. 139, and cases cited.]

Whether an inference of insanity *can* be legally drawn from the facts stated by a lay witness as a foundation of his opinion, is always a question of law which must be determined by the court. This being favorably ruled, then the court is warranted in per-

mitting the case to go to the jury upon the testimony of such witness, and it becomes the exclusive province of that body to determine whether or not the inference of insanity *ought* to be drawn. If any other rule could obtain then it would logically follow that a suit contesting a will on the ground of mental incapacity would be referable to the jury upon the mere opinion of an ordinary witness that the testator was insane, although no such inference could legally arise from the facts stated by the witness as the *basis* of his opinion. None of the lay witnesses testified to a single act or circumstance from which an inference of permanent insanity on the part of the testator could be drawn under the tests fixed by law to determine that state. Their testimony and its utter inadequacy is set out in my divisional opinion on file in the records of this court. Neither does the opinion of the majority point to any testimony in the entire record which tends to show in the remotest way that the testator was permanently insane *before* making his will. Under that state of facts the only possible theory on which contestant would have been entitled to go to the jury, is that his evidence tended to prove that the testator was *temporarily* insane at the *time* he made his will. Not only is there no evidence of this contention in the record but there was no pretence in the argument or brief that any such evidence was adduced on the trial of the cause, and the learned opinion of the majority admits there was none in the following statement contained therein referring to the effect of an epileptic seizure temporarily incapacitating the subject, to-wit: *"In this case contestant put in no proof showing that the will was made at such particular time; contestee's (proponents of the will) proof affirmatively shows to the contrary."* On this undenied state of this record and under the settled law as to the necessity of proof that the subject of temporary mental incapacity must be shown to have been in that condition at the *very time*

Turner v. Anderson.

of the making of the will, there was no case for the jury and the learned circuit judge ruled correctly when, of his own motion, and until compelled by this court to do otherwise, he took away from the jury the issue as to mental incapacity.

The sum and substance of all the testimony for contestants, as quoted and summarized in my divisional opinion, is that Mr. Anderson, the testator, was affected with the ordinary symptoms of epilepsy; he was sometime forgetful of persons and absent-minded and he displayed feeling when visiting his sister and niece and he did not have the full bodily and mental strength which characterized him before his epileptic seizures. But there is not a particle of evidence that he was unable, at *other times* and when *free* from the antecedent or consequent effects of his illness, to act rationally in the common things of his life; to make intelligent contracts; to collect interest; to look after and conserve his estate; to travel without any attendant on trains and street cars; to take care of his personal safety; to drive buggies; to carry purchasers to his farm for the purposes of selling them cattle and to transact his usual business at all times, except when under the sporadic and transient effects of epilepsy. The evidence is undisputed that these occasional seizures did not prevent him from making contracts and business deals during the latter years of his life and for nearly a year that he lived after making his will. The entire testimony shows beyond the shadow of a doubt that his spells were evanescent, infrequent, and not of the most violent type, and that they did not impair his ability to bear in mind with perfect distinctness on the 29th of March, 1905, when he made his will, the names of all his children and his grandchildren and all others, who were the natural objects of his bounty, and the full extent and values of his property and the manner in which he was dividing it among the beneficiaries of his will. There is nothing in the record that tends to

show that, for weeks before and after this time, he had experienced an epileptic attack of any nature whatever. I have been unable to find in this record any explanation of the action of the jury in breaking this will other than their possible opinion, that the testator, whom the evidence shows was in full possession of testamentary capacity at the time he made it, should not have devised less of his estate to his two grandchildren (only one of them being a contestant) than he gave to his *own living children and his surviving wife*. The statutes of this State, and the law of England since the 32nd of Henry VIII, have given to every citizen the right to make a will of his land and property and to discriminate therein against anyone of the natural objects of his bounty. I think the verdict in this case is in palpable contravention of the Statute of Wills and the settled rules of law governing the submission of cases to juries, and that the judgment should be reversed and the will probated. Hence I am constrained to dissent to the learned opinion of the majority of the court.