James J. Morrow et al., Appellants, v. The Board of Trustees of Park College, a Corporation, et al., No. 38558.—181 S. W. (2d) 945.

Division Two, July 3, 1944.

22

*James S. Simrall, Jr.*, and *Lawson & Hale* for appellants.

*Frank E. Tyler, Lucian Lane, Alan F. Wherritt* and *Gossett, Ellis, Dietrich & Tyler* for respondents.

LEEDY, P. J.—This is an appeal from a judgment of the Clay Circuit Court, entered on a directed verdict in favor of the proponents of the will of James J. Morrow, decd., in a statutory action brought by his son and daughter to contest said instrument.

The only questions presented are these: (1) Whether, under the petition (as amended by interlineation at the close of proponents' prima facie case) and the evidence touching the execution of the will, the issue of due execution thereof was one for the jury; and (2) whether contestants made a submissible case on the issue of want of testamentary capacity.

The will was dated September 5, 1930, and admitted to probate ten years thereafter, to-wit, July 29, 1940, following the death of testator on July 11, 1940, at the age of 81 years. This action was filed May 9, 1941, by James J. Morrow, Jr., and Maude Laura Miller, his only children, as contestants. His wife, Annie, also survived him, and she was appointed executrix. Although made a party defendant, she filed no answer and did not appear, so that the cause went to trial on the petition of plaintiffs (charging, as the sole ground of contest, want of mental capacity to make a will) and the answer of The Board of Trustees of Park College. Upon said trial, proponents made formal proof of the execution of the will, and of the testamentary capacity of the testator, and rested. At this juncture, contestants, with leave, amended their petition by interlineation by adding an allegation

attacking, for the first time, the due execution of the will, as follows: "That the same was not signed by deceased nor by two witnesses at deceased's request and in his presence, and was neither signed as nor declared by him to be his will." Contestants did not demur to proponents' prima facie case, but, after making the foregoing amendment, proceeded with their case by introducing testimony which went exclusively to the question of testator's mental capacity, at the conclusion of which, proponents requested, and the court gave, the peremptory instruction to sustain the will.

While we do not find the record to show exactly, nevertheless we treat as a fact, because stated by both parties, that at the time of his death, testator owned approximately 1,000 acres of farming lands in Clay County. It appears that less than 500 acres thereof were *specifically* disposed of by his will. However, the will contained a residuary clause under which his widow was made sole beneficiary. Summarized, these are provisions of the will: Item 1 directs the payment of debts and funeral expenses. Item 2 gives to his wife all personal property absolutely. By item 3 testator gave to his wife a life estate "in all the real estate of which I may die seized and possessed." By item 4(a), and subject to his wife's life estate, he gave his son, James J. Jr., a life estate in one tract (an undivided 4/5ths interest in 76 acres) with remainder to his son's bodily heirs, and upon failure of bodily heirs, then the remainder to Park College. [In this connection, it may be noted that the son had two children living at the time of his father's death.] By item 4(b) the testator gave other lands (120 acres), subject to his wife's life estate, to his son for life, with remainder to Park College. By item 4(c) still other land (80 acres), subject to the wife's life estate, he gave to Park College, subject, however, to the right of the son to enjoy a life estate therein upon certain conditions. By item 4(d) after the wife's life estate, he gave the remainder in a further tract (200 acres) to Park College, subject to the daughter's right to a life estate therein upon certain conditions. Item 5 provides, "All the rest, residue and remainder of my estate, real, personal and mixed, of whatsoever kind and wheresoever situate, is hereby given, bequeathed and devised absolutely to my wife, Annie Morrow." Item 6 nominated his wife as executrix, and directed that she be not required to give bond as such. While it does not conclusively appear, we infer from expressions of the witnesses that the instrument was typewritten, and that the several pages thereof were bound together under one cover. It consisted of eight pages. The signature of the testator was at the bottom of page 7. The signatures of the attesting witnesses appear on page 8, "following a half a dozen lines of typewriting." The attestation clause (omitting signatures) reads as follows: "The foregoing instrument was, at the date hereof, signed and declared by the said James J. Morrow, to be his last will and testament, in the presence of us,

who at his request, and in his presence, and in the presence of each other, have hereunto subscribed our names as witnesses thereto.''

██ It is not the contention of contestants that there was something in the case warranting the jury to disregard the uncontradicted testimony of the two attesting witnesses, but rather that their testimony in relation to the execution of the instrument was so fragmentary, indefinite and uncertain as to make that issue one for the jury. Nor is it contended that the testimony of said attesting witnesses was insufficient to establish, prima facie, testamentary capacity on the part of testator. On the contrary both had appeared in the probate court and under oath, and in writing, made the usual formal proof of testator's soundness of mind, and also gave sufficient oral testimony thereof on the trial in circuit court. No witnesses, other than the two mentioned (and the clerk of the probate court), were produced or examined on either side on the issue of due execution. Consequently, the question with which we are to deal is to be determined upon a consideration of their testimony. We shall, therefore, set out, either in summary or by excerpting, so much of said testimony as directly bears on the question of signing and attestation.

Frank D. Hamilton, Executive Vice-President of Commercial National Bank of Liberty, was one of the attesting witnesses. He had been connected with that bank since 1912; had known the Morrow family since childhood; testator was a customer of the bank in 1912, and continued as such until the time of his death; the witness saw, and conducted business with the testator frequently throughout that entire period, and during which testator borrowed large sums of money from the bank. At the time of his death he was indebted to the bank, on promissory notes, (given for the purpose of carrying on his extensive cattle feeding operations in partnership with his son, James J. Jr., one of the contestants) in the sum of $15,000.00 or $18,000.00. The purported will was handed to the witness, and the examination proceeded as follows:

''Q. . . . Tell me if you recognize your signature and recognize the document? A. That's my signature.

''Q. Do you recognize the document as something that you had to do with years ago? A. That's right.

''Q. Now, . . . I will ask you if you were present when Mr. James J. Morrow signed that document? A. *Yes, I was.*

''Q. On September 5, 1930? A. I must have been.

''Q. Do you recall where the document was signed? A. No, I do not.

''Q. Well, by that was it done out at Mr. Morrow's home or was it done here in the banking building or some place in Liberty? A. I am sure it wasn't done at Mr. Morrow's home but I don't know where here. . . .

"Q. Now, do you recall being requested to witness this document? A. *I must have been.*

"Q. Well, do you remember Mr. Main being there? A. He certainly was.

"Q. All right, Now, you and Mr. Main were both there in the bank, employees in the bank at that time? A. Yes.

"Q. Mr. Main then, what capacity did he have there? A. Assistant Cashier.

"Q. And do you remember who brought you and Mr. Main and Mr. Morrow together? A. No.

"Q. You don't know whether it was Mr. James Simrall, Sr., that brought you up to his office or came down to your bank? A. I think it must have been.

"Q. Now, then, were you and Mr. Roland Main and Mr. Morrow all together at the time Mr. Morrow signed the will? A. *I would say yes.*

"Q. And were you and Mr. Morrow and Mr. Main all together when you and Mr. Main signed as witnesses thereto? A. *I would say yes.*

"Q. And in your opinion on September 5, 1930, when you and Mr. Main witnessed this document, did Mr. Morrow declare it to be his will? A. *I am sure he did.* . . .

"Q. Well, what was said about you all signing it? Tell the jury how you happened to sign it? A. Just a matter of accommodation service, I see it quite often. Asked as a matter of convenience to witness signatures to wills.

 *Cross Examination.*

"Q. What time of day was it when Mr. Morrow signed this instrument? A. I couldn't tell you.

"Q. And the day of the week? A. I couldn't tell you.

"Q. You don't know whether it was in the bank or in Mr. Simrall's office? A. I really do not.

"Q. You don't remember it at all, do you? A. I didn't remember it *until* I was called to assist in proving the will.

"Q. And then you only remembered it because you saw your name at the bottom of it? A. That's right.

"Q. Isn't that a fact? A. That's right.

"Q. I notice the thing consists of eight pages of it and on the bottom of the seventh page appears the name of Mr. Morrow in ink, and over on the next succeeding sheet appears your name and the name of Mr. Main. Did you read that thing over? A. No, sir.

"Q. Do you know whether the first seven sheets are the same seven sheets, know of your own knowledge that they are the same seven sheets that preceded this statement when you signed it? A. I do not.

"Q. Do you know whether the preceding sheet that bears the name of Mr. Morrow is the same sheet that was there when you and Mr. Main signed it? A. All I know is that that's the signature of James J. Morrow and that's my certificate.

"Q. On the back? A. That's right.

"Q. But whether these are the same sheets that were there when you signed, you wouldn't undertake to say? A. No.

"Q. Because you didn't read them and didn't know anything about it? A. That's right.

"Q. And the sheets are not in tablet and there's nothing particularly striking or individualistic about the paper, kind of paper all the lawyers use and a lot of bankers? A. That's right. . . .

### Re-Direct Examination.

"Q. Mr. Hamilton, I'll hand you Proponents' Exhibit 1 and ask you if on the day you signed this attestation in July, 1940, you had any reason to believe that those preceding seven or eight pages weren't the exact ones— A. I had no reason to believe they weren't.

"Q. That you had seen Mr. Morrow sign there in the Commercial Bank? A. That's right.

"Q. You weren't suspicious or uneasy about the document at that time and you aren't now, are you? A. Well, I don't know what you mean by that.

"Q. I mean you don't believe that there's been any substitution—

"By Mr. Hale: I object to that as leading.

"By the Court: Objection overruled. He's your witness. Go ahead. He may answer. (Exception)

"Q. Read the question.

"Thereupon, the Reporter read the following question: 'Q. I mean you don't believe that there's been any substitution—'

"Q. (Continuing) In any of the pages in the document as it was the day you signed it? A. You want me to answer whether I believe there's any substitutions or not?

"Q. Yes, sir. A. *I don't believe there's any substitutions.*"

### Re-Cross Examination.

"Q. That's just a guess. A. Purely a guess.

"Q. In other words, you simply don't know anything about it one way or the other? A. That's really the answer.

"Q. That's all."

Roland Main, the other attesting witness, was at the time of the trial secretary of Home Owners' Realty Corporation. Previously he had been assistant cashier of Commercial National Bank of Liberty. He was assistant cashier on September 5, 1930, the date of the will. He testified as to the circumstances under which the will was executed, as follows:

"Q. I hand you Proponents' Exhibit 1 and ask you to look through the document and see if you ever saw it before? A. Yes, sir.

"Q. Did you know Mr. James J. Morrow in his lifetime? A. Yes, sir.

"Q. How long had you known him? A. Prior to his death, possibly twenty-five, six or seven years, something like that. . . .

"Q. You recognize your signature on that document there? A. Yes, sir.

"Q. Do you remember being with Mr. Main and Mr. Morrow—I mean Mr. Hamilton and Mr. Morrow in September, 1930, when that document was signed? A. Except [949] for those signatures, I remember nothing about it, Alan. *I know that I signed this document.*

"Q. And were you all together when you signed it? A. *I never signed a will any other way. We were all there.*

"Q. I wish you would tell the jury and Court whether or not you and Mr. Hamilton were present when Mr. Morrow signed it? A. Yes, sir.

"Q. And were you and Mr. Morrow and Mr. Hamilton all together when you and Mr. Hamilton signed it? A. Yes, sir. . . .

"Q. I wish you would look at that whole document with the exception of the last page and tell the jury whether or not in your opinion it's the exact instrument and document that you saw there in September, 1930?

"By Mr. Hale: I object to that. It's a matter of fact and not a matter of opinion.

"By the Court: He may state if he knows. (Exception)

"A. Read the question, please.

"Q. So far as you know, is that the same document that you signed there? A. *Yes, sir.*"

### Cross Examination.

"Q. I notice that it's got about eight sheets in it? A. I didn't count them. I guess that's about right.

"Q. I notice on the bottom of page 7 appears the name of James J. Morrow? A. Yes, sir.

"Q. And over on page 8 following half a dozen lines of typewriting appear the names of you and Mr. Hamilton. How much of that instrument did you see at the time you signed it? A. I never read a word of that instrument. *We saw Mr. Morrow sign it and Mr. Hamilton and myself*, and that's all I know about the instrument.

"Q. And you never saw any part of it at all except you think you saw the seventh page on which the name of Mr. Morrow appears? A. That's right.

"Q. And then the eighth page which you were looking at now on which the name of yourself and Mr. Hamilton is written? A. That's right.

"Q. The several sheets are not identified by signatures, either of Mr. Morrow or of the witnesses, and you would have no way of knowing and you wouldn't undertake to say whether the first six sheets, of your own knowledge, say whether the first six sheets were there or not? A. I would not, no, sir.

"Q. The only sheet that you would positively say was there when you signed is the sheet on which the name of you and Mr. Hamilton appears? A. And the signature of—the sheet bearing Mr. Morrow's signature.

"Q. You know that is his signature? A. Absolutely.

"Q. But you wouldn't undertake to say that one might not have been substituted? All you know about that is you didn't attest it any? A. No.

"Q. You know it's Mr. Morrow's signature? A. *I know that's Mr. Morrow's signature and I saw him sign it.*

"Q. Did you know Mr. Morrow pretty well? A. Did I know him?

"Q. Yes. A. Yes. Well, I say yes. I have never visited him in his home but I met him in a business way for years. . . ."

### Re-Direct Examination

"Q. At the time you and Mr. Hamilton signed this document for Mr. Morrow, did he declare it to be his will? What did he say about it?

"By Mr. Hale: I object to that.

"By the Court: He may state what he said. (Exception)

"A. Well, now, yes.

"Q. What did he say? A. He said—I can't remember this case specifically.

"Q. Your answer is yes, that he did declare it? A. *Yes, that's bound to be.*

### Re-Cross Examination.

"Q. As a matter of fact, you don't remember anything about it at all, do you? A. I would like to clarify it.

"Q. No, just answer my question.

"By the Court: He may answer the question and explain his answer. (Exception)

"A. May I explain that answer?

"By the Court: Yes, sir.

"A. Well, my answer was *that he did say it was his last will and testament.* Now, the reason I say he did, I have witnessed a lot of wills for Mr. Simrall and he always invariably says: 'Mr. So-and-So, this is your last will and I have read it over and explained all the paragraphs to you, and we have talked it over and you have asked Mr. So-and-So and Mr. Main to act as your witnesses.' That's an invariable custom of his when I sign.

"Q. Of Mr. Simrall's? A. Yes, sir.

"Q. So that you would know from that, that if Mr. Simrall were present, that he did that at that time? A. Yes, sir. In fact, I never witnessed a will for any lawyer that didn't ask those questions. . . .

"Q. And that's the only thing that makes you say now that he did declare it to be his last will and testament is because you know Mr. Simrall's practice? A. That's right.

"Q. That's all."

### Re-Direct Examination.

"Q. You recall Mr. Simrall being there, do you? A. No, sir.

"Q. But' from your familiarity with witnessing wills, if those questions hadn't been asked by Mr. Simrall, you would have asked Mr. Morrow, wouldn't you. A. I don't know (Laughing).

"Q. Well, of course, you had known and been familiar with the formalities of witnessing wills for many years? A. Yes, sir, I have witnessed a lot of wills.

"Q. And you know the formalities in this case were observed? A. Yes, sir.

"Q. Thank you."

### Re-Cross Examination.

"Q. You know that was the general practice and you presume they were? A. That's right.

"Q. Just presume it? A. *I never witnessed a will that that rule wasn't followed.*

"Q. Did you ever witness a will when Mr. Simrall wasn't there? A. I have witnessed a lot of wills that he didn't draw and wasn't there, yes.

"Q. That's all." (Emphasis ours.)

In the light of the foregoing facts, there can be no doubt that the complete attestation clause showing the observance of all statutory requirements constituted presumptive evidence that the will was in fact duly executed. German Evangelical B. Church v. Reith, 327 Mo. 1098, 39 S. W. (2d) 1057. And, as said in the same case, "The proponents do not abandon the presumption by presenting the testimony [of the attesting witnesses]. They are forced to do it, and may cross-examine, contradict and impeach the witnesses." But this case does not rest on the presumption alone, for the attesting witnesses took the stand, and testified not only to the genuine signatures of themselves and the testator, but that (in Mr. Hamilton's case) the testator declared the instrument to be his will; that he "must have been" requested to witness it; that he and Mr. Main signed as witnesses thereto, at which time the three of them were "all together"; that he had no reason to believe that any of the eight pages constituting the will had been substituted. Mr. Main, the other attesting witness testified to the same general effect, but more positively. He, too, as a banker and through practice, was familiar with the formalities re-

quired in the execution of wills, and the "invariable custom" described by him was amply sufficient to meet the requirements of the law. He was positive that he "never witnessed a will that that rule wasn't followed." Thus it will be seen that said witnesses severally vouched for the fact of attestation, impliedly by their subscription, and expressly by their oral testimony on the trial.

It is true these witnesses did not recall by whom the will was drafted, nor the place where it was executed. Neither did they have any recollection as to the circumstances under which they met, or were called together, for the latter purpose. But the trial was held twelve years after the will was executed, and any lack of positiveness or imperfect recollection on their part, in the respects mentioned, is to be regarded in connection with such lapse of time, thus suggesting the applicability, in aid of proponents case (if it requires aid), of the following rule: "The probate of wills does not depend on the recollection of subscribing witnesses. While mere negative testimony as to execution which may result from failure of memory is not of so much weight as positive testimony, the court will, in the absence of any question of mental incapacity or undue influence, relax somewhat the requirement of proof and admit the will to probate where the, inference is fairly deducible that it was duly executed and the failure of the subscribing witnesses to testify fully or positively as to all details may well be referred to lack of recollection. The due execution of a will may be sufficiently proved by subscribing witnesses testifying . . . that they never attested a will not executed with due formalities." [68 C. J., p. 1020.]

Point is made of the fact that the record does not disclose where the will was found after the death of testator, nor where it had been kept in the interval between the date of its execution and the time it was presented for probate. This aspect of the case was simply one to which the proof was not directed; that is to say, it was not explored by either side. Such proof not being indispensable to a prima facie case, we regard its omission as without legal significance.

Citation of authority is hardly necessary on the proposition that proponents have the burden of making prima facie proof of an alleged will, and of its due execution by testator of sufficient age, while of sound mind. [Fletcher v. Ringo (Mo.), 164 S. W. (2d) 904.] We hold proponents discharged this burden, and, on the showing made, a will prima facie valid was established. Contestants recognize that it has been held "in innumerable cases" that upon such showing "the trial court should peremptorily instruct the jury to return a verdict in favor of proponents, unless contestants have produced substantial evidence to the contrary." But they say that the rule of said cases is not applicable because "in none of them was there any issue *made by the pleadings* as to due execution of the alleged will." That the rule is not different by reason of the inclusion in the peti-

32

tion of an allegation of want of due execution is a proposition upon which we entertain no doubt.

A statutory will contest action has its peculiarities in burden of proof, in order of proof, in opening and closing, in the absence of a right of dismissal without a solemn probate or rejection of the will and in its freedom from cost bonds. Turner v. Anderson, 260 Mo. 1, 168 S. W. 943. The proponents occupy the position of a plaintiff in the respect that upon them is cast the burden of establishing the offered writing as the will of the deceased, and consequently they are entitled to open and close. "In every case contesting a will, proof by the proponents of the will of the sanity of the testator, as well as the due execution of the will, must be made, whether the contestants attack the will on the ground of the insanity of the testator, or not." [Berkemeier v. Reller, 317 Mo. 614, 296 S. W. 739; Major v. Kidd, 261 Mo. 607, 170 S. W. 879; Byrne v. Byrne, 250 Mo. 632, 157 S. W. 609; Goodfellow v. Shannon, 197 Mo. 271, 94 S. W. 979.] Being under the duty of proving, prima facie, the due execution of the will, we fail to appreciate how any additional burden is cast upon proponents, in the first instance, by the circumstance of a contestant alleging want of due execution as one of the grounds of contest. In this respect, the analogy between the question of proof of due execution, and that of testamentary capacity seems to be exact. Under the authorities, proof of both is required, whether challenged or not. Consequently, we have no hesitancy in saying that the propriety of submitting the question of due execution, even though made an issue by the petition, is a matter governed by the rule of the cases sanctioning a directed verdict for the will where, as at bar, the uncontradicted evidence established, prima facie, a valid will, and there was no countervailing evidence, examples of which are set forth in the margin.[1]

Preliminary to a discussion of the remaining question, we further sketch, in brief outline, the general situation as reflected by the record, and about which there is no dispute, as follows: Testator lived on his large farm about four miles Northwest of Liberty. He was 70 or 71 years of age at the time the will was drawn, September 5, 1930. The contestants, the son and daughter, were, respectively, 36 and 50 years of age at the time of trial. The daughter was married, and she was the mother of two children, both daughters. She and her husband lived in Kansas City. They removed from Clay County

---

[1]Dowling v. Luisetti, 351 Mo. 514, 173 S. W. (2d) 381; Walter v. Alt, 348 Mo. 53, 152 S. W. (2d) 135; Beckmann v. Beckmann, 331 Mo. 133, 52 S. W. (2d) 818; Spencer v. Spencer (Mo.), 221 S. W. 58; Goedecke v. Lindhorst, 278 Mo. 504, 213 S. W. 43; Sanford v. Holland, 276 Mo. 457, 207 S. W. 818; Southworth v. Southworth, 173 Mo. 59, 73 S. W. 129; Callaway v. Blankenbaker, 346 Mo. 383, 141 S. W. (2d) 810.

It will be noted that in the last two cases cited the issue of due execution was raised by the pleadings.

in 1925. The son, James J. Jr., continued, as he had always done, to live with his father and mother. He was married in 1929 and brought his wife to live with his father and mother. They lived together as one family, and ate all their meals together down to the date of the father's death. James, Jr., had two children, one of whom, James J. III, "little Jimmie" as he is sometimes referred to, was physically handicapped from birth, in having "one arm considerably shorter than the other." Between this child and his grandfather there was a natural attachment.

Testator's farming operations, which included cattle feeding, were on a large scale. That he prospered and was highly successful was shown by contestants, attested, also, by the fact of having accumulated his large holdings in farm lands from a start with only 160 acres. After about 1934 the farming operations were carried on in full partnership with his son under the firm name of J. J. Morrow & Son. In "recent years" most of the work and looking after the details of that business was done by the son. However, in the matter of financing, the testator always signed the notes. He was a regular attendant at the Presbyterian Church for 30 or 40 years, and took his family with him.

Testator's farm, on which he had lived practically all his life, was located in close proximity to that known locally as "the Foley place," the latter having been the situs of a tragedy occurring in the middle 90's wherein the mother and sister of testator's wife were victims in a double murder. The curious will find the gruesome facts thereof reported in State v. Foley, 144 Mo. 600, 46 S. W. 733, reversing and remanding the conviction, for murder in the first degree, of the victims' brother.

On cross-examination, the witness Hamilton stated he always thought of the testator as "different," in that he was generally in very much of a hurry, didn't visit a whole lot, and was inclined to be somewhat nervous. Mr. Main said that testator's inclination to be nervous "would be the only peculiarity that I had noticed;" that when he came into the bank "it was business right now, and he was gone;" he was sometimes impatient when he had to wait.

The petition charged that on September 5, 1930, and for a long time prior thereto, testator did not have mental capacity to make a will, and he was not of sound mind, in that he was suffering from monomania and insane delusions to the effect that his children (the contestants) intended to kill him, or cause him to be killed. To support this charge, contestants called the eight witnesses whose testimony will be summarized (except as to those portions thereof which have been incorporated in the general outline above), for the purpose of determining whether the evidence was sufficient to make a submissible case on the issue of want of mental capacity.

James J. Morrow, Jr., testified that his wife and his father got along together "as well as any two families could"; that his father didn't want him to get off the farm, or to get away from the house at night—"he thought I should be at home," because "more meanness was done at night"; that he had no objection to his leaving during the day; that his father always kept loaded firearms in the closet of his bedroom, but did not have occasion to use them; that the witness was permitted to use the shotgun to go hunting; that his father "wouldn't go to bed in a lighted room. He would go from the sitting room where the light was, into his bedroom and turn down a folding bed in the dark and retire without any light. When he was sitting in the living room after dark, the blinds were always pulled down"; that his father objected to raising the blinds or opening the doors so that the light would show outside; that on one occasion when his mother wasn't at home, his father cut short pieces of 1x2's, and set them in the windows to scotch them, so one would have to break the windows to enter; that his father was careful to see that the house was locked, and the windows locked; that he allowed only one window to be open in his bedroom at night, and that being "the one closest to where mother was"; that on one occasion during the last year of his father's life they were at home together, and his father "was wandering around the house and he asked me where his shotgun was and why it wasn't loaded. We had removed it from his closet, and put it out close to our room, with no shells in it. He wanted to know where the shells was. He said to me, the only time it was ever mentioned in my presence, 'Somebody is going to come in and kill me like they did those Foley women;'" that at the time the alleged will was executed (September 5, 1930) the relations between them were agreeable and pleasant, but that his father did not [953] discuss with him "any of his intentions in regard to the drawing of this will or disposition of his property."

The testimony of the other contestant, the daughter, Mrs. Miller, was to the following effect: That until they removed from Clay County in 1925, she and her husband lived on what was known as the Jaret Williams farm, which "corners the home place"; and while living there she and her husband frequently visited in her father's home—"scarcely missed a week or ten days but what we saw them"; that as to difficulties and arguments with her father, she had "no more than any child has"; that she knew of no ill-feeling between her father and her husband; that her father "had a gun and a pistol most of the time," which he kept loaded, and as a child she remembered seeing the pistol under her father's pillow, and the shotgun was kept "in the closet right next to the door"; that she knew of no occasion her father had to use the weapons, and that he "scarcely ever" went hunting; that when she lived at home they did not have electricity, but had coal oil lamps, and her father "would always have

the curtains down and every door and window was locked after night''; that her father never expressed any fear of anyone or anything in her presence; that she was lead to believe he entertained a fear by reason of the fact that there were ''very few people living in the country that ever lowered their blinds, and you could look out over the country, and see the lights, and our curtains were always pulled''; that her father did not have any close friends who visited in his home, and he ''scarcely ever'' visited with any of his neighbors socially in the evening, and, in fact, never went anywhere in the evening to any extent; that her two daughters visited at their grand-father's, the testator, and she never heard of any trouble between them. On cross-examination she was asked how far back she recalled ''seeing that pistol under the pillow,'' and she replied, ''five or six years old. I can remember things very distinctly that happened when I was five years old . . . I could remember that very easily because other things that happened in '96 that I remember very distinctly.'' [Probably referring to the Foley murder, which occurred November 17, 1896.]

The testimony of the contestants themselves as to testator's practice in reference to keeping the blinds drawn, and the house locked at night, and keeping firearms at hand was corroborated by the son-in-law and daughter-in-law and one other witness.

The witness, Roy Sparks, had done blacksmithing for testator for more than thirty years. He described him as being of ''a nervous, tense temperament'' and as being ''just a little jerky, flighty-like, it seemed to me on a subject and then off to something else''; that during the last ten or twelve years of his life he did not carry on a connected conversation for any length of time. On cross-examination, the witness admitted that testator's ''characteristics of being quick on the speech and short conversations'' extended over the whole period of their acquaintance, or that ''he seemed to be practically the same way''; that ''he wasn't like most farmers are in trying to carry on a conversation with you or talk on any one subject very long.''

The witness, Fred Land, was a neighbor and had known testator for more than forty years. For about fifteen years he bought eggs from testator, usually going for them after night when he would find the lights off and the house locked. Mrs. Morrow, testator's wife, would answer the door. ''I generally got the eggs on the porch and when he found out who it was, he would generally come out on the porch and talk to me.'' Referring to his manner of conversation the witness testified: ''He would generally talk about the big headlines in the paper, anything unusual about that and sometimes you would ask him a question or two and you would think he forgot for a minute, and then he would flash out the answer right away.'' The testator never said anything to him about, nor did he ever hear him discuss,

the Foley murder case. The witness further said he never noticed testator being nervous, "only in his talk."

Witness Frank Gabbert, another neighbor, had been well-acquainted with testator since 1928, in which year he entered into an arrangement with testator whereby he took care of some of the latter's sheep (put them in a lot at night), in exchange for which the witness turned some cows into testator's pasture. The testator furnished the salt for the sheep. At times the supply of salt would be exhausted, and the witness would say to testator, " 'Mr. Jay, we ought to have some salt,' and he said, 'Well, let them do without,' and the next day he would say, 'Why don't you get some salt for them if you are out?' " On other such occasions "he would say, 'Why, you should have told me about the salt' when I had already told him." Witness further testified: "You would talk to him on one subject and pretty soon he would be talking about something else . . . without any connection at all." This condition existed in 1928. On cross-examination, the witness testified that the arrangement in question was "a satisfactory sort of deal," and a fair trade on both sides, and that testator seemed "to know what it was all about" when he was trading with him; that testator would be there every week to look at the sheep, and somtimes every day; at times he would make inquiry about the sheep, and sometimes he didn't; that testator's statement as to the number of sheep was correct, as far as the witness could recall.

Charlie Rice testified that when James J. III was a small child, two or three years of age, he had a conversation with testator about a grove of catalpa trees which testator had set out, and in that conversation testator said, "Little Jim might need some posts after a while, he would have them growing for little Jim. Said he was satisfied he might need some posts—might not do him any good but might do little Jim some good"; but that the testator never mentioned to him the matter of making a will.

Another witness, John Barnes, had worked for testator and later rented land from him. He testified that in the negotiations for renting that testator "talked like he was going to let me have it. He said he would study about it a day or two, and so I would see the man in probably two or three days and bring up the subject and he had forgotten all about it, didn't remember it at all"; that this happened three or four times about 1930 and prior thereto; that testator would be "talking to him and the first thing you knew he would be quiet a minute or two and then start about something else;" that testator never went into a "deep" discussion of the Foley murders, "but practically everytime we would go by the old Foley place—the road run right between the house and the pond, an old pond that was there, and everytime we would go through there he would point out in the pond and says 'Right there is where they found the pocketbook.' The first time that I went through there he told me about

that and I didn't know anything about that and I said 'What pocketbook?' and he said 'Mrs. Foley's' and then told me that the mother and daughter, I believe, he said were murdered in that house.'' He further testified that they ''would have occasion to go through it maybe once or twice a year'' over a period of about nine years, and testator repeated practically the same statement everytime. On one occasion while ricking baled hay testator had given the witness directions as to the manner of performing the work which witness followed, but that later in the day when testator returned and inspected the work, he said he had not done it right. The witness remembered when testator bought a tractor and accessories from John Lewis, an implement dealer at Platte City, instead of buying from the Liberty Marketing Company of which he was a director. He remembered testator saying something about why he did not buy from the Liberty Company, but could not remember what was said.

John Lewis, the implement dealer, had formerly been in that business at Nashua in Clay County. He testified that he had sold testator farming implements since 1920; that in 1928 or 1929 he sold him an International tractor (the same brand as that carried by the Liberty Company); that at that time the testator mentioned to him that he was a member of the board of the Liberty Company, and that he thought he said, 'What makes me buy a tractor from you when I am President of the Liberty Marketing Board?'' He further testified that in 1939 or 1940 he stopped at the Morrow home on a warm day, and said to testator '' 'What do you mean Mr. Morrow out here hoeing, working hard as hot as it is?' and he made the remark, 'Well,' he says, 'John, I don't want my little grandson,' and patted him on the head, 'to have to work when he gets old like I do.' '' The witness expressed the opinion that testator ''seemed like he was of a nervous disposition.'' On cross-examination, it was developed that testator's son, Jay, Jr., was with him when the negotiations for the purchase of the tractor and equipment were carried on and that he deferred largely to Jay's judgment as to what was needed; that in the transaction some used equipment was traded in, and there was a balance owing of $600.00, for which sum testator gave his check.

James Robb, another neighbor, testified to having noticed that testator ''would go to talking and he would talk right along for a little bit and then he would kinda of ▮▮▮ hesitate like he was studying about himself and go off on some other subject''; that this condition was especially noticeable the last two years before his death, ''but back of that it seemed like it grew on him worse all the time.'' On cross-examination, the witness said that he had a good deal of confidence in, and went over and visited in a business way with, the testator; that he advised with testator a good deal concerning the development of the natural gas field in the community about 1930. In that connection he was asked: ''Q. When he talked with you about

this pipe line matter and other things about 1930, was his conversation connected and intelligent? A. Yes, most of the time, only just at times I noticed he would go on and talk all right like he always did but it seemed like at times he would get to studying and kind of wander off."

The witness, Ben I. Hall, was an oil and gas promoter, and in 1929 or 1930 was operating in the vicinity of the Morrow farm; the first man he met in the community was testator, and this was in December, 1929; thereafter he had frequent occasion to ride over the country with him in a car, and when they were in the vicinity of the Foley place testator called his attention to the Foley murder. His estimate was that he repeated the same story "possibly fifteen or twenty times," always describing the persons who were murdered "as being Annie's (his wife's) mother and sister"; that the murder "occurred in the night, and that they were lying in bed in the house and someone fired through [a window] and killed them." He pointed out the pond where the pocketbook and the gun that was supposed to have been used were found. At a time fixed at a year or a year and a half prior to the death of testator, this witness detailed a conversation with testator at the site of a thicket of black locust trees on his farm. At that time testator was negotiating for the purchase of fence posts, and this conversation ensued: " 'You want to buy fence posts, why don't you use those? Those are black locust. Why buy them when you have got thousands of them?' 'Oh, no, Hall,' he said, 'I don't want to disturb those posts.' " Elaborating on this, the witness explained, "He wanted to keep those so little Jimmie would have posts when he needed them, that fence posts were becoming difficult to get and he further stated that that piece of land upon which those poles were was a piece of land that Jimmie—that's his grandchild—would have some day." Asked if the testator told him then if he had made a will six or seven years previously leaving it all to "Park College," the witness replied, "No, . . . I think it was in 1930, he stated then that he had worked hard for his money and he didn't propose to leave anything to anybody—let them work the way he did." His cross-examination showed that his business in the neighborhood was the acquisition of a block of oil and gas leases, of which the Morrow premises were one of the principal parts; that the block was not complete, and his geological studies indicated he should obtain certain other premises, and "I went to Mr. Morrow to obtain his help in the securing of these leases from the other parties . . . I used his position in the community more as an influence" rather than his actual assistance in the negotiations, he being considered the wealthiest man in the community, and one who operated on a very large scale.

The attending physician, who had treated testator from and after June 18, 1938, testified that the cause of death was cancer of the

stomach. This witness was asked to state his opinion as to whether the testator was of sound mind, but an objection thereto was sustained, and error thereon has not been assigned.

Can it be said that the foregoing constitutes substantial evidence of testamentary incapacity, thus entitling contestants to go to the jury on this issue? The answer is so obviously in the negative as to make it useless to enter upon an extended discussion of the question. Not one of the witnesses gave it as his opinion that testator was of unsound mind, in connection with which contestants say, "None was asked to express such opinion, for the reason that probably no one individual testified to such abnormalities in deceased as to have legally justified him in expressing such opinion." But the things thus denominated as "abnormalities" were not such, either singly or in the aggregate, as to warrant a jury in finding want of testamentary capacity, for it has been held that " 'A testator with mind enough to understand,' the ordinary affairs of life, the kind and extent of his property, who are the natural objects of his bounty, and that he is giving his property to the persons mentioned in his will, in the manner therein stated, is capable of making a will under ▮▮▮ the law of this state." Rex v. Masonic Home, 341 Mo. 589, 108 S. W. (2d) 72. "Extreme old age, with its attendant physical and intellectual weaknesses, does not, of itself, incapacitate the testator and raises no presumption of his not having a disposing mind; if he is able to transact his ordinary business, and is capable of understanding the extent of his property and appreciates the natural object of his bounty. Nute v. Fry, 341 Mo. 1138, 111 S. W. 2d 84; Whitacre v. Kelly, 345 Mo. 489, 134 S. W. 2d 121. Nor does the mere fact that a testator has an imperfect memory, is forgetful of names of persons, requires the repetition of questions, any evidence of such mental disease that will render him incapable of making a will. Loehr v. Starke, 332 Mo. 131, 56 S. W. 2d 772." Hennings v. Hallar, 347 Mo. 827, 149 S. W. (2d) 338. In addition to the cases just cited, there are numerous others where contestants' evidence touching the issue of testamentary incapacity was also very much stronger than in the case at bar, and, notwithstanding this, it was held insufficient to make the question one for the jury. See Walter v. Alt, supra; Callaway v. Blankenbaker, supra; Frank v. Greenhall, 340 Mo. 1228, 105 S. W. (2d) 929; Townsend v. Boatmen's Bank, 340 Mo. 550, 104 S. W. (2d) 657; Gaume v. Gaume, 340 Mo. 758, 102 S. W. (2d) 636; Stevens v. Meadows, 340 Mo. 252, 100 S. W. (2d) 281; Berkemeier v. Reller, supra; Turner v. Anderson, supra.

From what has been said it follows that the judgment should be, and it is, accordingly, affirmed. All concur.