MORTON et al.   v.   SIMMS et al.

No. 43819.

Supreme Court of Missouri.
Division No. 1.

Dec. 14, 1953.

Rehearing Denied Jan. 11, 1954.

436

Wm. Waye, Jr., St. Charles, for appellants Mabel Morton and Ben Morton.

Redmon Morton, pro se.

Floyd Morton, pro se.

H. K. Stumberg, St. Charles, Robert V. Niedner, Niedner & Niedner, St. Charles, for respondents.

HOLLINGSWORTH, Judge.

This is an action brought in the Circuit Court of St. Charles County under the provisions of Section 468.580 RSMo 1949, V.A.M.S., to probate an alleged will of Aurelia Carter following its rejection by the Probate Court of that county on the ground she "lacked the necessary testamentary capacity" to make the same. The jury found the proffered instrument was not her will and judgment was rendered accordingly. Plaintiffs and defendants Redmon Morton and Floyd Morton appealed to the St. Louis Court of Appeals, which transferred the case here on the ground title to real estate is involved.

■ The record does not reveal the extent or value of the property of which Mrs. Carter died seized, but it does reveal she died seized of real estate, which, as will appear, her alleged will undertakes to dispose of contrary to the laws of devolution of real estate in the event of intestacy. Consequently, title to real estate is involved and jurisdiction of the appeal lies in this court. Constitution of Missouri, Art. V, § 3, V.A.M.S.; Ray v. Nethery, Mo.Sup., 255 S.W.2d 817.

Aurelia Carter, a widow with no descendants, died a resident of St. Charles County on August 10, 1950, at the age of 73 years. She left surviving her numerous nieces and nephews. Among these were plaintiff Mabel Morton, the wife of the coplaintiff, Ben Morton, and defendants Louis Simms, John Simms, Clifford Simms, Kate Johnson, Joe Morton, Hattie Ford, Redmon Morton, Lelar Steel and Floyd Morton. Defendants Kate Obee and Harrison Carter are her stepchildren.

The will (1) directs the sale of "my lands" and that out of the proceeds the sum of $100 be paid to each of the eleven defendants; (2) bequeaths "my household goods" to defendant Lelar Steel and plaintiff Mabel Morton; (3) leaves the residue of her estate to plaintiffs Mabel Morton and Ben Morton; (4) names Mabel Morton as executrix and W. R. Dalton as an alternate, with a request that neither be required to give bond. It closes in these words:

"In Witness Whereof, I have hereunto set my hand this 3rd day of March 1950.
                            "Aurelia Carter."
The attestation clause immediately following reads:

"The foregoing instrument, consisting of this page only, was at the date thereof signed and declared by the said Aurelia Carter to be her last Will and Testament in the presence of us, who at her request and in her presence and in the presence of each other have subscribed our names hereto as witnesses.
                    "Elmer Borgstede
                    Mrs. Margaret Borgstede"

The petition alleges, however, that in fact the will was signed by testatrix and attested by the above-named witnesses on June 12, 1950. The answer denies this allegation.

After overruling plaintiffs' motion for a directed verdict submitted at the close of all the evidence, the trial court gave all the instructions requested by both parties. They submitted two issues of fact: (1) whether the will dated March 3, 1950, was signed by Aurelia Carter and duly witnessed by Elmer and Margaret Borgstede on June 12, 1950, and (2) the mental capacity of Aurelia Carter to make a will on that date. Plaintiffs' instructions directed that if the jury found the affirmative of both of those issues, then they should declare the instrument to be the last will and testament of Aurelia Carter. Defendants' instructions were the converse thereof.

Appellants contend that inasmuch as the will had attached to it a complete attestation clause, supplemented by the testimony of the attesting witnesses that it was duly executed by Aurelia Carter and that she was of sound mind when the same was executed, a prima facie case was made; that there was no evidence showing her mental

incapacity to make a will on June 12, 1950, or any other date; and that, therefore, appellants' motion for a directed verdict should have been sustained; and that the court erred in admitting in evidence the certificate of the probate court rejecting the will.

Respondents contend that the burden of proving due execution by and mental capacity of Mrs. Carter remained upon appellants throughout the entire trial; that appellants pleaded and submitted the issue of a will executed on June 12, 1950; that the jury was at liberty to reject the whole of the testimony of any of appellants' witnesses they believed testified falsely to a material fact; that appellants' motion for a directed verdict did not state the grounds upon which it was predicated and must, therefore, be disregarded; that a jury issue was made by the evidence; and that the aforesaid certificate of rejection was properly admitted.

The testimony is voluminous, replete with vague innuendoes and conclusions, frequently partisan, and utterly irreconcilable. A concise statement of it cannot be made. Omitting immaterial, repetitious and cumulative testimony insofar as possible, we shall narrate such portions as are necessary to determine the issues of law here involved.

W. R. Dalton, whom the record showed to be an aged man, testified in behalf of plaintiffs: He is a practicing lawyer in St. Charles County and knew Aurelia Carter during her lifetime. He wrote a will for her at her home on February 28, 1950. He also wrote the will in issue. According to his best recollection, it was written between the dates of May 15, and May 25, 1950. Aurelia asked him to date it back to February 28, 1950, but he refused to do so. He did, however, date it back to March 3, 1950.

On cross-examination, he stated: After he had written the February will, Aurelia later sent for him and told him what she wanted with reference to the will in issue and he wrote it at his office in Wentzville. He also prepared a power of attorney from Aurelia to plaintiff Mabel Morton some-

time in 1950. It empowered Mabel to transact business for Aurelia. His recollection is that it was also dated back. His memory is "practically blank" as to how he sent the will in issue to Aurelia after writing it in Wentzville. He was not present when it was executed and witnessed. He represented the proponents of the will in issue when it was offered for probate in August, 1950. Mr. Waye (present counsel for plaintiffs) did not then represent them. He cannot recall when or how the executed will in issue came back to his office, but it was in his possession before the hearing in the probate court.

The testimony of Margaret and Elmer Borgstede was, in substance: They are husband and wife and lived on Aurelia Carter's farm for about five years prior to March, 1951, and had known her for about ten years. They signed two wills for Aurelia, one on February 28, 1950, and the other (the will in issue) on June 12, 1950. They do not remember seeing the date set forth in the will in issue. Before signing that will, Aurelia sent them a post card (which they did not keep) to come to see her. When they arrived, she told them she had changed her will and asked them to sign it. They saw her sign it, and they then signed it. She was of sound mind. They remember the date of signing the will in issue because Mrs. Borgstede wrote the date on a calendar when they returned home that evening. The calendar was then produced. It showed pen marks encircling the date of June 12th and the words "Signed will". It also showed the same marking and entry on the date of February 28th.

On cross-examination: Mrs. Borgstede admitted she testified in the probate court that she signed the will in issue around the first of March and that she also testified at that hearing she signed only one will when she knew she had signed two. Her explanation was: "They were talking about a will signed the 3rd of March. I knew there was a will signed the 12th of June and I wasn't going to say it was in existence because they would say 'Where is it' and I didn't know. * * * because I didn't want to tell that there was another will be-

cause I didn't know where it was." She did not mention the calendar in the probate court; no questions were asked about it. She admitted that all other entries made on the calendar (which related to breeding of livestock, setting of hens, etc.) were written in pencil; and said that she wrote the entries relating to the will in ink because her father had told her she should "keep track" of important dates like that. After the hearing in the probate court, they (the Borgstedes) went to see Probate Judge Karrenbrock to explain their mistake about signing only one will, but he would not talk to them. They also went to see Mr. Stumberg (one of counsel for defendants) but he was busy and they became disgusted and went home. They told Mr. Waye about their mistake the first time they saw him.

On cross-examination, Elmer Borgstede stated: He did not remember testifying in the probate court that he had signed only one will. When he testified in that court to signing a will "early in the spring", he was confused and was thinking of the February will.

Plaintiff Mabel Morton testified: She is a niece of Aurelia Carter. On Christmas Eve of 1949, John Simms, witness' brother, told her that Aunt Aurelia was ill and wanted to see her and insisted she go at once. She went that evening. Dr. McMurray had been there the day before. Her aunt did not have a stroke. She met the witness at the door. Harrison Carter was the only other person there. Witness went there every day thereafter, doing her aunt's washing, ironing, housecleaning, and feeding the hogs and chickens. At one time her aunt had her go to the Borgstede home to ask them to come over. Her aunt's mental condition was good. She took her aunt to Dr. McMurray's office in May and June of 1950 and took her riding in an automobile. She also took her aunt to Dr. Tyler's office. About a week before her aunt died on August 10, 1950, she said to witness, "Mabel, you have tended to me all the way along. You are the only one I can depend on to do anything for me.

* * * This is my will. Don't open it. If I pass out you take this will to Mr. Dalton and have him to read it." Her aunt told her that John and Louis Simms persuaded her to make another will, which was not made right and she had made another. Her aunt also told witness she always said she was going to make a will for whoever attended her, but that after she got the will made John and Louis quit coming around her, but she was going to fool them. Witness took the will in issue to Mr. Dalton's office after her aunt's death.

A postal card addressed to witness and bearing a postmark of June 7, 1950, was admitted in evidence. It read: "Please bring me $1.00 chick feed for my little chicks, 1 peck corn meal, 2 loaves bread, and I will make it alright. A nice steak. Yours truly, Aurelia."

Dr. Wendell H. Tyler, a physician practicing his profession in St. Charles County, testified in behalf of proponents: He had known Aurelia Carter for eight or ten years. He saw her professionally in 1946 and on March 5, 1950. Mabel Morton brought her to his office. She was suffering from hypertension and mitral insufficiency and from headaches and dizziness, frequent urination at night and a heart condition, shortness of breath. Her blood pressure was 210 over 100. Her mental condition was "very good", "sound". He saw her again in his office on April 10th and May 1st. Her blood pressure remained about the same. He saw no indication of any previous stroke; prescribed digitalis for heart and blood pressure tablets containing one-quarter grain of phenobarbital. In such doses it would not affect her mind.

On cross-examination: Witness stated he did not see Mrs. Carter after May 1, 1950. When he saw her on March 5, 1950, she told him Dr. McMurray was treating her. If she had had a stroke in December, 1949, there would have been evidence of it when he saw her in March. He gave her thirty-six tablets containing phenobarbital to be taken three times a day. It is a depressant if taken in sufficient quantity.

A grain and one-half is a maximum dose. Mrs. Carter was not suffering from senile dementia.

Marie Clinton, a former school teacher and presently Dr. Tyler's secretary, testified that she knew and saw and talked with Mrs. Carter when she visited Dr. Tyler's office on March 5th and April 10th, 1950, and that her mind was sound.

Respondents offered evidence of the tenor following:

Defendant Louis Simms, a minister and restaurant employee, testified: Aurelia Carter was his mother's sister. Aurelia partly raised him. Mabel Morton is his sister. Aurelia became sick about three days before Christmas of 1949. He and his brother, John, alternated in staying with her each night until about the middle of March. Harrison Carter was there. Mabel was out there every day. His aunt was bedfast. She would "go off" into some kind of a spell and would not know anyone was around for six to twelve hours at a time. His aunt told him, "Louis, you are my nephew. I am satisfied for you to help me in and out of bed." His aunt also said that Mabel had told her not to take Dr. McMurray's medicine. He gave it to her, and she would "go off in these comas", and sleep six to twelve hours. The medicine was given her every night. There were times she did not know anyone was on the place. She was very weak, slept too much, and complained that her limbs hurt. Her condition improved somewhat but on the fourth Sunday in May she was "very poorly" again. Mabel handled her money affairs during her illness. Before that Aunt Aurelia handled them. She could not write after she became ill. Mabel told him, "You are not going to get anything" and that Aunt Aurelia was not capable of taking care of her money any more. She made the last statement both in December and in March.

On cross-examination: He "guessed" Aurelia's mind was "alright" when he talked to her the third day after Christmas. When he saw her eating breakfast at different times in February, he did not know whether her mind was all right or not; he was no physician. He saw his aunt after March 15th, but not around June 12th.

John Simms corroborated the testimony of his brother, Louis, and further testified: He did not know that Aurelia was a patient of Dr. Tyler on March 5th and did not think she was able to go any place at that or any other time. When she was sleeping some four or five hours, he called it a "coma". He had seen Aurelia sign her name. Neither the name of Aurelia Carter appended to the February will nor the name of Aurelia Carter appended to the will in issue was her signature. He gave no opinion as to her mental condition.

Harrison Carter, a stepson of Aurelia Carter, testified: He stayed with her from July, 1949, until March 15, 1950; took care of the hogs, cut wood and things like that. Mrs. Carter gladly took the medicine left for her by Dr. McMurray; it eased her. She did not talk to him about the farm or business matters. He never knew of her seeing Dr. Tyler. She recognized, "maybe", people when they came to see her during the month of February and until he left in March. She was conscious, but as to doing business, "I wouldn't approve of it." Mr. Dalton had the will in issue in a drawer and read it to several of them after Mrs. Carter's death.

On cross-examination, he testified: Mrs. Carter never left her home from December until he left on March 15th. He never saw her after March 15th.

Dr. H. C. McMurray, a physician practicing his profession in St. Charles County, testified: He had known Aurelia Carter since 1940 and had treated her intermittently. The immediate cause of death was cerebral apoplexy, the onset of which was December 23, 1949. He saw her at that time. She was complaining of headache, suffering from nausea, vomiting, showed a marked elevation of blood pressure, incoherent in her speech, and some confusion as to time and disorientation as to place, and slight paralysis of the upper and lower extremities. He next saw her on

January 13, 1950. She was in bed and slightly improved. He saw her again on January 27th, still in bed. She was rational at that time. The disorientation had disappeared. On February 6th, there was a recurrence of disorientation and incoherence in her speech and thoughts. He again saw her on February 14th and 15th, but had no notation as to her mental condition. On these visits he gave her the usual bedside medicine, digitalis for her heart and phenobarbital. The phenobarbital would further depress her mental faculties and produce sleep. He either saw her or sent medicine to her on February 20th and 27th, March 1st and 3rd, and June 14th; never saw her between March 3rd and June 14th. On March 3rd, he changed her medication. It was not a continuation of barbiturates. He testified without objection that when he saw her in February she would have recognized her relatives, but doubted if she could have outlined her property or could have told with great accuracy what her belongings consisted of. When she took barbiturates and was under their influence she was not of sound mind; and there were times when she was not cognizant of "things", due to her condition and not to medication. In March, she still suffered persistent loss of function from her stroke.

On cross-examination, he testified: Phenobarbital would cause her to sleep six or seven hours. There could be aftereffects. Continued use of it would result in apathy, a "hangover" effect. The witness agreed with a statement of Dr. Forrest Ramon Davison, of the Upjohn Company, that "barbital and phenobarbital produces six to eight hours of sleep with little aftereffect except when given in large doses", and then admitted he would not say that Mrs. Carter would have any mental difficulty as a result of medication of a quarter grain of barbiturates such as he was giving her. He had no clear recollection of her condition on February 14th. He thought she continued to take phenobarbital after February 27th in conjunction with other medicines. He, however, prescribed none for her between the dates of February 27th and July 11th.

Judge Karrenbrock testified: Nothing was mentioned at the hearing in the probate court as to the February will. Neither the Borgstedes nor Mabel Morton nor Mr. Dalton mentioned a will that had been executed on June 12th.

H. K. Stumberg, one of counsel for respondents, testified to the same effect. He admitted, however, that Mr. Dalton told him before the probate court hearing that he had drawn two wills for Aurelia Carter.

The pleadings in this case present two essential issues of fact: (1) the due execution and attestation of the will in issue *on June 12, 1950,* and (2) Aurelia Carter's mental capacity to make the same *on that date.* The conflicting contentions of the parties on appeal as to the legal effect of the testimony adduced upon the issues of fact pleaded require us to determine whether plaintiffs were entitled to a directed verdict and, if they were not, then to determine whether the trial court erred in submitting the issue of Mrs. Carter's mental capacity on June 12, 1950.

In this State, the law requires that every will (with certain exceptions not here involved) shall be in writing, signed by the testator, or by some person at his direction and in his presence, and attested by two or more competent witnesses subscribing their names thereto in the presence of the testator. Section 468.-150 RSMo 1949, V.A.M.S. The statute is mandatory. German Evangelical Bethel Church v. Reith, 327 Mo. 1098, 39 S.W.2d 1057, 1060, 76 A.L.R. 604. The will in issue had appended thereto the purported signature of Aurelia Carter, followed with the undisputed signatures of Margaret Borgstede and Elmer Borgstede appended to a complete certificate of attestation. However, John Simms, when asked the direct question on cross-examination if the purported signature of Mrs. Carter was genuine, said it was not. We need

not here determine whether he was qualified to so testify, that feature having been waived by appellants' counsel in propounding the question. The result is that there was a question of fact as to whether the will was ever signed by testatrix.

Next for consideration is the attestation clause. It recites every constitutive fact necessary to due execution as required by the law of this State. Those recitals remain throughout the case as substantial evidence of the facts therein stated, despite the testimony of Margaret Borgstede and Elmer Borgstede that the will was signed by testatrix and witnessed by them on June 12, 1950, and not on March 3, 1950, as the will and attestation clause on their face purport. German Evangelical Bethel Church v. Reith, supra; Morrow v. Board of Trustees of Park College, 353 Mo. 21, 181 S.W.2d 945, 950; Potter v. Ritchardson, 360 Mo. 661, 230 S.W.2d 672, 677. The burden of proving that the will was signed and witnessed on a date other than that set forth therein rested upon appellants. Page on Wills, Vol. 2, § 751, p. 454; 68 C.J., Wills, § 752, p. 986; In re Kohn's Estate, 172 Mich. 342, 137 N.W. 735; Thompson v. Karme, 268 Ill. 168, 108 N.E. 1001. See also German Evangelical Bethel Church v. Reith, supra. There was, therefore, a submissible issue of fact as to whether the will was signed and witnessed on June 12, 1950.

Plaintiffs' motion for a directed verdict is challenged because it did not state the grounds upon which it was based. The motion was orally made and no objection is made because of that fact. Immediately thereafter counsel for appellants stated at length to the court the grounds upon which he based the motion. Counsel for respondents also argued the motion on the merits. The court was fully apprised of the grounds relied upon. That was sufficient. Oganaso v. Mellow, 356 Mo. 228, 201 S.W. 2d 365, 366; Schubert v. St. Louis Public Service Co., Mo.App., 206 S.W.2d 708, 710.

In the oral presentation of the motion, appellants argued, first, that the evidence was conclusive as to the execution and attestation of the will on June 12, 1950; and, second, that there was no evidence of Mrs. Carter's mental incapacity on that date. Respondents argued that there was evidence of her mental incapacity on March 3, 1950, at which time they insisted the will was executed. However, they did not choose to submit that issue to the jury. Therefore, it is clear that when both parties elected by their pleadings and trial theories to submit only the date of June 12, 1950, as the determinative date of the issue of execution, attestation and mental capacity, both were bound by that submission. (We refrain from consideration of the sufficiency of the evidence to warrant submission of Mrs. Carter's mental capacity to make a will on any date other than June 12, 1950.)

Both of the Borgstedes testified that Mrs. Carter was of sound mind when she signed and they witnessed her will on June 12, 1950. The rule in this State is well established that when plaintiffs adduced evidence of due execution of the will and of Mrs. Carter's soundness of mind at the time of its execution the burden shifted to respondents to go forward and adduce substantial evidence that testatrix was of unsound mind at that time. Wipfler v. Basler, Mo.Sup., 250 S.W.2d 982, 989, and cases therein cited. "There can be no submissible issue of testamentary incapacity without some evidence of such incapacity *at the time* the will was executed. Evidence, not too remote, of mental unsoundness either before or after the will's execution is admissible, provided it indicates that such unsoundness existed at the time the will was made." Smith v. Fitzjohn, 354 Mo. 137, 188 S.W.2d 832, 833. That there was an issue and contradictory testimony as to due execution of the will and the date thereof does not abrogate or change the rule above announced. Morrow v. Board of Trustees of Park College, 353 Mo. 21, 181 S.W.2d 945, 951 [6–8].

There was no evidence that Mrs. Carter did not possess mental capacity to make a will on June 12, 1950. The evidence does show she was mentally sound

at intervals during her illness. Dr. Mc-Murray's testimony that, due to illness or the effect of phenobarbital, she would not with accuracy know the extent or nature of her property on certain occasions during the time she was his patient certainly does not constitute evidence of her mental incapacity at any other specific time, and especially on June 12, 1950. He had not seen her since the latter part of February. See Smith v. Fitzjohn, 354 Mo. 137, 188 S.W.2d 832, 833.

■ Respondents further insist, however, the testimony of Louis Simms that Mabel told him in December and in March that Aurelia was "not capable of taking care of her money any more" amounts to evidence of an admission she was not of sound mind. The contention is without merit. In the first place the jury could not know what Mabel considered as essential to the capacity to handle money and neither could it know whether she referred to Aurelia's mental condition or rather to her physical condition. Furthermore, such an admission, if made, constitutes no evidence of Aurelia's mental condition in June. The testimony, considered in its entirety, shows at most some mental unsoundness on two or three specific occasions, due to brain pressure or the effects of phenobarbital or both, but no such condition is shown to have existed later than March. So, therefore, even if Louis Simms' testimony be accepted as true, and assuming (not holding) it amounted to an admission by Mabel that Aurelia was of unsound mind, it still did not shed any light upon Aurelia's mental condition on June 12, 1950. Smith v. Fitzjohn, supra.

■ It follows that in submitting the issue of mental incapacity of Mrs. Carter to make the will in issue on June 12, 1950, the jury could have found that the will was duly executed and attested on June 12, 1950, and then found it not to be her will on the ground she was mentally incapable to make it on that date, of which there was no competent evidence. The pleadings, instructions and the evidence in this case warranted the submission only of the issue of the actual signing of the will by Aurelia Carter on June 12, 1950, and its attestation by the Borgstedes on that date. However, due to the submissible issue of fact relating to execution and attestation on June 12th, the court did not err in overruling appellants' motion for directed verdict. But it did err in holding there was a submissible issue of Mrs. Carter's mental capacity to make a will on June 12th, and in directing an affirmative finding on that issue as a prerequisite to the establishment of her will. In so doing, the trial court forced upon appellants an issue they should not have been required to assume. Under such circumstances appellants could do nothing else. They cannot, therefore, be held to have voluntarily submitted that issue. Mt. Vernon Car Mfg. Co. v. Hirsch Rolling Mill Co., 285 Mo. 669, 227 S.W. 67, 74[6], and cases therein cited.

■ Appellants began the presentation of their evidence by calling Probate Judge Karrenbrock to the witness stand and asking him: "Do you have a paper in your possession dated March 3, 1950, purporting to be signed by Aurelia Carter?" Witness replied that he did and handed counsel for appellants a document which he had marked as Exhibit 1. Counsel for appellants shortly thereafter stated: "We offer in evidence Plaintiffs' Exhibit 1 and ask leave to read it to the jury later." Thereafter, on cross-examination of Judge Karrenbrock, counsel for respondents asked him the basis upon which the will was rejected, to which counsel for appellants objected, stating that the answer admitted (which it did) its rejection in that court. Counsel for respondents then insisted that by offering Exhibit 1, both the will and certificate of rejection attached thereto had been admitted in evidence. Counsel for appellants insisted he had offered only the will and that the certificate attached thereto was no part of it. The court deferred ruling the question at that time. Numerous colloquies concerning the matter ensued between the court and counsel throughout the trial, finally resulting in the court permitting counsel for appellants (after adducing proof of execution, attestation and Mrs. Carter's mental

capacity to make a will) to read the will; and counsel for respondents, over the objection of appellants, to read the certificate of rejection to the jury. In so ruling, the trial court erred. As stated by counsel for appellants, the certificate was no part of the will and it is apparent counsel did not offer it in evidence, regardless of the fact that the certificate was attached to the will when it was marked for identification and offered. The certificate recited the will was rejected "for the reason that the said Aurelia Carter lacked the necessary testamentary capacity to make, publish and declare said instrument of writing as her Last Will and Testament." Manifestly, its admission was prejudicial.

Respondents' motion to dismiss the appeal for failure to comply with 42 V.A.M.S. Supreme Court Rule 1.08 has been considered and is overruled.

The judgment is reversed and the cause remanded.

All concur.