In the ESTATE OF Millard
DENNIS (Deceased).

Nona Dee DENNIS, Appellant,

v.

Melvin DENNIS, Executor of the
Estate, Respondent.

No. WD 37172.

Missouri Court of Appeals,
Western District.

June 3, 1986.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 24, 1986.

Application to Transfer Denied
Sept. 16, 1986.

Ross Eshelman, Poague, Wall, Eshelman & Cox, Clinton, for appellant.

Garrett R. Crouch, Garrett R. Crouch, III, C.B. Fitzgerald, Warrensburg, for respondent.

Before DIXON, J. Presiding, and MANFORD and NUGENT, JJ.

DIXON, Judge.

Plaintiff, the widow of Millard Dennis, appeals a trial court denial of her motion to take against the will of Millard Dennis as an omitted spouse, or in the alternative, by election.

The primary issues presented are whether a prenuptial agreement signed by plaintiff and decedent was ambiguous so as to permit the introduction of extrinsic evidence to aid in construction of the agreement, and whether the evidence supported the trial court's interpretation of the agreement. Plaintiff appellant also questions the exclusion of plaintiff's evidence under the Dead Man's Statute and admission of defendant's opinion evidence of value.

The widow and appellant Nona Dee Dennis and the decedent Millard Dennis were married March 4, 1982. At the time of the marriage, both were in their sixties, each had been previously married, and each had children. Both the widow and the deceased owned farms in Henry County and both had personal property, including bank accounts. The events of the day of marriage are the subject of conflicting evidence. There is evidence from which the trial court could have found that the parties went to a lawyer's office in Osceola to execute an antenuptial agreement, went to another county to be married, and then returned to the decedent's Henry County farm. The evidence will also support the conclusion that the decedent's will was executed before the marriage. The will omitted any reference to the appellant wife. The prenuptial agreement, omitting the notarization and signatures, reads as follows:

NOW ON this 4th day of March, 1982, Milard [sic] Dennis, hereinafter called 1st party and Nona Dee Pasley, hereinafter call [sic] 2nd party and [sic] do hereby Stipulate and AGREE as follows:

That the parties contemplate marriage and are desirous of preserving their separate property as to prevent same from becoming intermingled with the property of the other and from becoming marital property.

IT IS understood that each party hereto owns real estate in their [sic] separate name and it is the desire of the parties that said real estate remain the separate property of the respective party by whom it is now owned. A copy of deeds to said property are attached hereto and made a part hereof.

IT IS FURTHER understood and agreed that the parties hereto own various items of personal property, too numerous to be sent [sic] out herein. It is the desire and intention of the parties that said property shall, after the marriage of the parties, remain ·the serarate [sic] property of the party in whom ownership is now vested.

IT IS FURTHER understood and agreed by the parties that all property whether, real, personal or mixed, acquired following the marriage of the parties shall become marital property only if deeds or [sic] conveyance or other evidence of ownership is so indicated by referring to the parties as husband and wife.

Some two years after the marriage Millard Dennis became very ill and was hospitalized. This illness and hospital confinement brought various family members together with the appellant wife at the hospital. There were numerous occasions when the wife made statements concerning her husband's property.

A. We talked about the property that dad owned several times. Nona told me she was aware of the property. She also mentioned to me many times that there was a will. She knew about the will, and there was an agreement that had been signed and that there was no worries if I was worried.

Q. Did she explain what she meant, "There is no worry"?

A. I assumed—

MR. WALL: I object.

Q. (By Mr. Fitzgerald) You can't assume, Melvin. Sorry.

A. All right.

Q. But did she explain what she meant by "worried", if you were worried?

A. She asked if I had been concerned about what might happen to dad's property.

Q. And what did you say?

A. At that time I had no worry about it, and then she explained to me that there was, again, a will and a pre-marital agreement, and there would be no problems.

. . . .

Q. What discussions, if any, did you have with her regarding property and estate matters there at the hospital?

A. Two weeks before daddy passed away, Nona and I had again talked about what might happen, and she, again, said, "There should be no worry on your part, because things have been taken care of."

. . . . .

Q. Now, did you have any discussion after the marriage with Mrs. Dennis, and if so, state what that conversation was with regard to how the property that she owned and Mr. Dennis owned would be divided?

A. It is just as simple as it can be.

Q. Just state the conversation. Did you have such a conversation with her?

A. Yes, I have heard it.

Q. What was the conversation?

A. Well, she owned her property and he owned his.

Q. Did you have any discussion with her while your brother was in the hospital?

A. Yes.

Q. And how long was he in the hospital, David?

A. Well, I'm not just exactly—quite a while. He was in there twice.

Q. Did you visit him at the hospital.

A. I sure did and didn't miss very many days.

Q. And Mrs. Dennis was there, too?

A. Yes, she was there most of the time.

Q. And during the time that you were there, did you have any conversations with her regarding what would become of Millard's property if he died?

A. She made the remark to me time and time again that she signed the agreement; she wanted nothing that he had, and that was it.

. . . .

THE COURT: Now, one other thing, to make sure I have got this straight. In your conversations with Mrs. Dennis, prior to your father's death, did she tell you that your father had a will?

THE WITNESS: She did.

THE COURT: Did she tell you when he made that will?

THE WITNESS: As of a date?

THE COURT: Yes.

THE WITNESS: Yes, before they were married, but no date.

THE COURT: She told you that she knew he made a will and knew when he made it; is that right?

THE WITNESS: She said they had agreed before they were married. I don't know of any date.

THE COURT: Well, now, was she referring to this agreement, or was she referring to a will?

THE WITNESS: Will and agreement were both mentioned.

The lawyer who prepared the document testified. A portion of his testimony concerning conversations with the husband and wife was objected to by the wife.

■ The wife's initial point on appeal is bifurcated. She first asserts that the meaning of the prenuptial agreement was plain from the face of the agreement, and that, therefore, the objected-to testimony of the lawyer should not have been considered by the trial court. The objection at trial was that the testimony violated the parol evidence rule by "varying or adding to" the agreement. The objected-to portions of the lawyer's testimony relate solely to his dis-

cussions with the parties. The testimony is as follows:

A. I talked to both of them together in my office at the courthouse, as I remember it. I was Prosecuting Attorney at that time. I just explained to them, and they talked to me about what they owned. I talked to them about what each of them owned, generally speaking. Each of them indicated they had their own separate property, that they didn't want the property of the other, and I explained that is what they were doing—that is what they wanted to do. That is basically it, as I recall it.

Q. Judge Sperry, did you mention the fact that the execution of this instrument would preclude Mrs. Dennis from electing to take any, against any will that would be executed thereafter?

[Objection to the question overruled].

A. I don't know.

. . . .

A. They just told me that they were going to get married, and that they wanted to make sure that each of them kept their own separate property. And the other conversation I related a moment ago followed, just generally.

This testimony was admissible against the objection made under the rule announced in *Cure v. City of Jefferson*, 380 S.W.2d 305 (Mo.1964), and *Phipps v. School District*, 645 S.W.2d 91 (Mo.App. 1982). *Cure*, relying upon the Restatement of Contracts and Corbin on Contracts, and *Phipps*, relying upon the Restatement of Contracts (Second), hold that before a court interprets the meaning of a contract, it may receive evidence of the circumstances surrounding the making of the contract including the " 'persons, objects, and events to which the words can be applied and which caused the words to be used.' " *Cure*, 380 S.W.2d at 311 (quoting 3 Corbin on Contracts, Section 536, page 28); *see Phipps*, 645 S.W.2d at 103. The Restatement (Second) of Contracts § 212 comment c (1981) reads as follows:

**c. Statements of intention.** The rule of Subsection (1) permits reference to the negotiations of the parties, including statements of intention and even positive promises, so long as they are used to show the meaning of the writing. A contrary rule in the interpretation of wills is sometimes stated broadly enough to apply to the interpretation of contracts, but that rule is subject to exceptions and rests in part on the more rigorous formal requirements to which wills are subject. Statements of a contracting party subsequent to the adoption of an integration are admissible against him to show his understanding of the meaning asserted by the other party.

Applying these rules to the instant case, the evidence of the circumstances of the parties, the property they owned, their families, and the impending marriage is all admissible. Also admissible are the wife's admissions of her intentions and her understanding.

The written agreement is not ambiguous, but in the circumstances its *meaning* is not clear. The parties are assumed to have intended something in the making of the agreement, and with respect to property owned at the time of the marriage, the agreement is meaningless if "separate property" is given its legal definition. Under the circumstances the statements made by the wife—that there was a will and a premarital agreement and that she intended to make no claim to her husband's property—support an inference that the parties were intending to waive inheritance rights in each other's property by using the term "separate property" in the prenuptial agreement.

■ What has been said also disposes of the wife's claim that there was no substantial evidence to support the construction of the agreement adopted by the trial court.

■ In another point, the wife argues lack of evidence to support the judgment in two other particulars. She contends there was no substantial evidence to show that she knew that she had a right to take against the will. To the contrary, however, the whole tenor of the statements she made to the husband's son, as well as the fact that both husband and wife had property and children, both had attended the lawyer's office to sign a prenuptial agreement that allowed each to keep his or her "separate" property, and the fact that the husband's will, which excluded the wife, was executed on the same day as the marriage all support a finding that the wife was aware of her right to inherit and waived it. The wife asserts also that the evidence does not support a finding of "full disclosure" of the husband's property to her. The unobjected-to testimony of the attorney and the husband's children discloses that the property of each was a matter of common knowledge. These parties had no easily-hidden or secret assets. The farms, cattle, and houses were all readily visible. This was not a spur of the moment marriage; the proximity of the parties' residences and the contemplated marriage make it an almost inescapable inference that they were each aware of the other's holding of land and physical assets.

■ The wife next attacks the court's finding that the will was executed in contemplation of and contemporaneously "with the marriage." She claims no evidence supports that finding, and points to some evidence of the witnesses which indicates that the will was signed by the witnesses before the marriage. The date of the will was March 4th, the same date as the marriage. The recital of the will as to the date of the execution is substantial evidence of the fact, despite testimony to the contrary. *Morton v. Simms,* 263 S.W.2d 435, 442 (Mo.1954); *see also Morrow v. Board of Trustees,* 353 Mo. 21, 31, 181 S.W.2d 945, 950 (1944); and *Potter v. Ritchardson,* 360 Mo. 661, 230 S.W.2d 672 (1950). The burden is on the proponent of a different date of execution to prove the contrary. *Morton,* 263 S.W.2d at 442. There is substantial evidence to support the trial court's finding that the will was executed contemporaneously with the marriage. The parties were married in Hermitage in Hickory County, Missouri. The lawyer labeled the

property agreement a prenuptial agreement and said it was executed before the marriage. The trial court's findings that the will was executed contemporaneously with and in contemplation of marriage is amply justified by the evidence. The wife further argues that § 474.235, RSMo Supp. 1984:

> 1. If a testator fails to provide by will for his surviving spouse who married the testator after the execution of the will, the omitted spouse shall receive the same share of the estate he would have received if the decedent left no will, unless it appears from the will that the omission was intentional....

demands that the wife be entitled to one-half of the estate if the evidence shows that the will was executed prior to the marriage. The statute is not as absolute as the wife contends. The statute does not give to every wife who is omitted from a will executed prior to the marriage one-half of the husband's estate. It intends to give such a share only to those wives who were not intentionally omitted from the will. The statute on its face cannot be applied without considering the circumstances of the case. Obviously one cannot determine from the will itself whether a subsequent marriage has occurred. In order to apply the statute, there must be a surviving spouse who claims a marriage was contracted after the execution date of the will. The statute then directs that an inquiry be made whether "an omission was intentional." Such an inquiry necessarily embraces a consideration of the circumstances surrounding the marriage and the execution of the will. Otherwise the exception to the statute is meaningless.

In the circumstances of this case, the trial court's finding that the execution of the will was contemporaneous with and in contemplation of the marriage is amply and fully supported by the evidence. When that finding is considered in the light of the statute and in view of the obvious omission of the wife from a will that was executed on the very day of marriage, it must be concluded that the omission was intentional. It must be remembered in the applica-tion of § 474.235 that this statute was intended to replace the statutory and common law doctrine which required revocation of a will upon a change of circumstances such as a subsequent marriage. The difficulty with a revocation based on changed circumstances is that it interferes with the other provisions of the will. For that reason the doctrine was widely criticized. Section 474.235 is intended not to revoke the will, but only to provide for the unintentionally-and inadvertently-omitted spouse, and not one who was intentionally and consciously omitted from the scheme of disposition.

The wife also complains that the trial court erred in permitting the defendant to give opinion testimony concerning the value of plaintiff's real estate. The question of the qualifications of an expert to render an opinion with respect to the value of land is a matter lying within the discretion of the trial court. *State ex rel. State Highway Commission v. Bloomfield Tractor Sales, Inc.*, 381 S.W.2d 20, 25 (Mo.App. 1964).

A rule cannot be formulated which requires a witness to have specific knowledge or information before he may be qualified to testify concerning land value. The background of the witness must show a familiarity with the property and a basis for knowledge, and the ability to give information which will assist the jury in determining the ultimate issue. *State of Missouri ex rel. State Highway Commission v. Baron*, 400 S.W.2d 33, 37 (Mo.1966). The extent of evidence showing such competence of the witness is a matter going to the weight and not the admissibility of testimony when a threshold level of competency has been achieved. *Id.* In this case the witness knew the farm, knew the value of land in the vicinity of the farm, knew the wife's house in Clinton, and knew the value of comparable real estate in Clinton. The thrust of the wife's argument is that the opinion evidence was not sufficient to support a finding that fair consideration was given for the parties' mutual release of

their marital rights in the other's property. The agreement itself recites that both owned real estate and personal property, and it is a fair inference from the circumstances that each knew of the other's property. There is no suggestion that these parties met and married on the same day— the marriage was impending for some time, and it is inconceivable in the circumstances of this case that each would not have had a general idea of the property of the other. The precise value of the property is not necessary to afford consideration to an agreement of this sort. *Roberts v. Estate of Roberts*, 664 S.W.2d 634, 638–39 (Mo. App.1984).

■ The wife asserts that the court erred in refusing to permit her to testify. She asserts that the objection that she was disqualified under the provisions of the Dead Man's Statute, § 491.010, RSMo Supp.1984 (modified RSMo Supp.1985), was improperly sustained. The wife argues that by introducing the wife's admissions through the testimony of others, the defendant waived the Dead Man's Statute. This argument misconceives the thrust of the Dead Man's Statute. The statute disqualifies the witness, not the testimony. None of the witnesses who testified as to admissions by the wife were disqualified under the Dead Man's Statute, and there is no reason to find a waiver by the use of their testimony. The issue has been resolved squarely in *Wilson v. Milligan*, 710 S.W.2d 348 (Mo.App.W.D.1986), and *Bolin v. Anders*, 559 S.W.2d 235, 244 (Mo.App. 1977).

The judgment of the trial court is affirmed.

All concur.